# Exhibit 1

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of November 30, 2020 (the "Effective Date"), by and between FOUNDATION AUTO HOLDINGS, LLC, a Delaware limited liability company, or its permitted assigns pursuant to Section 9.6 hereof ("Buyer"), and WEBER MOTORS, FRESNO, INC., a California corporation d/b/a BMW Fresno ("Weber Motors"), and CJ'S ROAD TO LEMANS CORP., a California corporation d/b/a Audi Fresno and Porsche Fresno ("Road to Lemans", and collectively with "Weber Motors", "Seller"). In this Agreement, Buyer and Seller are sometimes referred to individually as a "Party" and together as the "Parties."

**RECITALS**

A.    Seller owns certain assets used or useful in the operation of BMW, Audi, and Porsche motor vehicle sales and service businesses (the "Dealerships") located at: (i) 7171 North Palm Avenue, Fresno, California 93650 (the "BMW Site"); and (ii) 7121 North Palm Avenue, Fresno, California 93650 (the "Audi/Porsche Site").

B.    Buyer wishes to buy, and Seller wishes to sell, substantially all of the assets used by Seller in connection with or related to each of the Dealerships located at the BMW Site and the Audi/Porsche Site upon the terms and conditions of this Agreement.

C.    The BMW Site and the facilities located thereon are collectively referred to herein as the "BMW Property". The Audi/Porsche Site and the facilities located thereon are collectively referred to herein as the "Audi/Porsche Property". Additionally, Seller leases that certain unimproved real property located in Fresno, California with APNs 405-560-49 & 405-560-50 (the "Unimproved Property", and collectively with the BMW Property and the Audi/Porsche Property, the "Property").

D.    The Property is leased by Seller pursuant to that certain leases, a true, correct and complete copy of which (including all amendments thereto) shall be delivered to Buyer within ten (10) days of the Effective Date (the "Leases"). Buyer desires to have direct leasing relationships with the landlords under the Leases. Buyer and Seller desire to work together to accomplish this either through assignment of the Leases to Buyer or for Buyer to enter into new leases with the applicable landlords.

**AGREEMENT**

Therefore, the Parties agree as follows:

**1.    PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES.**

**1.1    Purchased Assets.**  Subject to the terms and conditions of this Agreement, on the Closing Date (as defined in Section 3.1), Seller will sell to Buyer, and Buyer will purchase from Seller, all of the assets listed on Schedule 1.1 in accordance with Schedule 1.1 (collectively, the "Purchased Assets"), free and clear of all security interests, liens, restrictions, claims, encumbrances or charges of any kind ("Encumbrances"). Buyer and Seller acknowledge and agree that the Purchased Assets shall include all of the assets determined in accordance with Schedule 1.1. For the avoidance of doubt, Purchased Assets shall include all of the goodwill associated with, and the assets used in the operation of, all of the Dealerships.

**1.2    Excluded Assets**. The Purchased Assets do not include those assets described on Schedule 1.2 (the "Excluded Assets").

**1.3**    **Liabilities Not Assumed**.  Except (i) as set forth in this Agreement or (ii) for those ongoing obligations on and after the Closing Date described in Schedule 1.3 which are specifically identified and agreed to be assumed by Buyer in its sole discretion prior to the Closing Date, but only to the extent that (A) such liabilities thereunder are required to be performed after the Closing Date, (B) were incurred in the ordinary course of business and (C) do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller prior to the Closing (the "Assumed Contracts"), Buyer shall not assume, or in any way be responsible or liable for, any liability, obligation, claim or expense of the Seller arising out of the operation of the Dealerships on or before the Closing Date, whether absolute, contingent, accrued, known or unknown, including, without limitation, any liabilities or obligations described in this Agreement or the schedules attached hereto or liabilities or obligations resulting from or arising out of (a) violations of any applicable law, regulation or ordinance relating to antitrust, monopoly or trade regulation, (b) violations of any applicable law, regulation or ordinance relating to labor or employment, (c) violations of, failure to comply with, or any obligation arising under, any applicable law, regulation or ordinance relating to any welfare, retirement, vacation or other benefit plan or any plan covered by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or the failure to comply with the continuation coverage requirements of Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, (d) chargebacks from the cancellation/termination of finance or insurance products on vehicles sold by the Seller prior to the Closing Date, (e) any taxes arising out of the operation of the Dealerships or the ownership of the Purchased Assets for any period ending on or prior to the Closing Date, (f) any pending or threatened law suit, claim or other action against the Seller, whether from personal injury, wrongful death or property damage, or whether arising out of employment or a contractual or alleged contractual right, (g) violations of any applicable Environmental Law (as defined below), (h) any accrued bonuses or salary of any Seller employee prior to the Closing Date, (i) Seller accrued workers' compensation payments, or (j) any contract or lease to which Seller is a party and that is not an Assumed Contract, including, without limitation, the BMW Fresno Collective Bargaining Agreement (as hereinafter defined) and the BMW Fresno Pension Fund Trust Agreement (as hereinafter defined) (collectively, "Seller's Obligations").  Notwithstanding the foregoing, subject to (ii)(A)-(C), inclusive, above, Buyer shall assume all contracts of Seller which were entered into by Seller in the ordinary course of business on arms-length terms in accordance with industry standards which are necessary to the conduct of the Business as currently conducted; provided, however, in no event shall Buyer assume the BMW Fresno Collective Bargaining Agreement or the BMW Fresno Pension Fund Trust Agreement, and such contracts are hereby expressly excluded from the definition of "Assumed Contracts".

**1.4**    **Assumed Contracts.**  Nothing in this Agreement will constitute an agreement to assign or an attempted assignment of any contract or other commitment for which any requisite consent or waiver to the assignment thereof has not been obtained.  To the extent permitted by applicable law, if any requisite consent or waiver has not been obtained on or prior to the Closing for any contract or commitment which Buyer desires to be an Assumed Contract, the applicable contract or commitment shall be held by Seller in trust for the benefit of Buyer and Buyer will perform the obligations of Seller thereunder and be entitled to receive all money becoming due and payable under and other benefits derived from the contract or other commitment immediately after receipt by Seller.

**2.    PURCHASE PRICE; PAYMENT; PRORATIONS; ALLOCATIONS; INVENTORY SETTLEMENT.**

**2.1    Purchase Price; Payment.**

(a)    The amount of consideration to be paid by Buyer to Seller for the Purchased Assets will be determined in accordance with Schedule 1.1 and will include Buyer's assumption of the Assumed Contracts and the Leases (collectively, the "Purchase Price").  The Parties shall work in

good faith to conduct any post-Closing reconciliations of the Purchase Price as may be necessary hereunder.  All references to currency hereunder are to lawful money of the United States.

(b)     Buyer has delivered Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00) (together with any interest thereafter earned thereon, the "Earnest Money Deposit") to First American Title Insurance Company, as escrow agent (the "Escrow Agent").  If the transaction contemplated by this Agreement shall be consummated, the Earnest Money Deposit shall be applied to the Purchase Price at the Closing (as defined below) and if this Agreement shall be terminated and the transaction contemplated hereby abandoned, then the Escrow Deposit shall be applied as set forth in Article VII.  If requested by any Party hereto or the Escrow Agent, the Parties and the Escrow Agent shall enter into an escrow agreement in a form mutually agreeable to the Parties and Escrow Agent that will govern the escrow duties and rights of Escrow Agent; provided, however, that such escrow agreement shall not conflict with the provisions hereof.

(c)     The balance of the Purchase Price (i.e., the Purchase Price less the Earnest Money Deposit, which Earnest Money Deposit the Parties shall cause to be released to Seller in connection with the Closing), subject to adjustment in accordance with Section 2.2 below, shall be paid by Buyer to Seller at the Closing, by wire transfer of immediately available funds pursuant to wiring instructions delivered by Seller to Buyer in writing prior to the Closing Date, or other immediately available funds as Seller and Buyer may mutually agree.

**2.2     Prorations.**  All sales taxes, personal property taxes (including, but not limited to, inventory taxes) and assessments which are past due or have become due upon any of the Purchased Assets or in connection with the operation of the Dealerships on or before the Closing Date will be paid by Seller at the Closing (as defined in Section 3.1), together with any penalty or interest thereon.  Current personal property taxes will be prorated and adjusted between Buyer and Seller as of the Closing Date on a due date basis.  If current tax bills are unavailable on the Closing Date, the prior year's tax bills will be used for proration purposes and taxes will be re-prorated between Buyer and Seller when the current year's tax bills are received.  Any amounts owed by either Party with respect to such re-proration will be paid to the other Party within ten (10) days after the determination of such re-proration.  All operating expenses (other than prepaid expenses) of the Dealerships for the month of Closing including, without limitation, rent payable under the Leases and utilities, will be prorated and adjusted between Buyer and Seller as of the Closing Date based on a thirty (30) day month.  Seller shall pay any transfer, sales or similar tax due as a result of the transactions contemplated hereby.

**2.3     Allocations.**  The consideration for the Purchased Assets will be allocated in accordance with Schedule 2.3, which Schedule will be completed by Buyer and Seller at the Closing.  This allocation will be conclusive and binding for all purposes, and each Party will file all income or other tax returns in a manner consistent with such allocation.  Buyer and Seller shall execute an agreement with respect to such allocation at Closing if desired by either Party.

**2.4     Inventory Settlement**.

(a)     In the event that record or beneficial ownership or possession of any Purchased Asset has been transferred to Buyer on the Closing Date without the corresponding amount determined in accordance with Schedule 1.1 for such items being added to the Purchase Price, then Buyer shall promptly transfer, or cause to be transferred, such items to Seller; provided that, to the extent that Buyer and Seller, acting reasonably, mutually agree to the value of such items, Buyer and Seller may mutually elect for Buyer to keep such items and Buyer shall pay such mutually agreed value to Seller in the next Inventory Settlement.

(b)    In the event that record or beneficial ownership or possession of any Purchased Asset has not been transferred to Buyer on the Closing Date but the corresponding amount determined in accordance with Schedule 1.1 for such items were added to the Purchase Price, then Seller shall promptly transfer, or cause to be transferred, such items to Buyer; provided that, if such items cannot be located or are not otherwise available to be transferred or the Parties (each in their sole discretion) mutually agree that Seller shall not transfer such item, the Seller shall pay to the Buyer the value of such items that were mutually agreed to in the next Inventory Settlement.

(c)    For a period of three (3) months following the Closing (the "Inventory Settlement Period"), the Parties shall use their commercially reasonable efforts and work in good faith to identify and resolve any inconsistencies between the Purchased Assets transferred or not transferred (as applicable) to Buyer at Closing, on the one hand, and the corresponding amount determined in accordance with Schedule 1.1 added to the Purchase Price, on the other hand. To the extent any amounts become due and payable from one Party to another pursuant to Section 2.4(a) and Section 2.4(b), the Parties shall periodically (and unless mutually waived by the Parties, at least once per calendar month) settle such payments on a "net" basis (each such settlement, the "Inventory Settlement"), with Buyer, at its option, having the right to set-off such amounts owing Buyer from any distributions due to the Seller Principal (as defined below) under the LLC Agreements (as defined below).

## 3.    CLOSING.

### 3.1    Closing Date.

(a)    Subject to the terms and conditions of this Agreement, the closing of the transactions (the "Closing") contemplated by this Agreement and any other agreement or instrument executed by the Parties pursuant to this Agreement (collectively, the "Related Agreements") will occur on a mutually agreeable date, at a mutually agreeable location, at 10:00 a.m. local time no later than thirty (30) days after all necessary Manufacturer (as defined below) and governmental approvals are received for the transactions contemplated under this Agreement so long as all other conditions set forth in this Agreement are satisfied (the date on which such Closing occurs, the "Closing Date").  The Closing Date shall occur no later than January 30, 2021 (the "Closing Date Deadline"); provided, however, the Closing Date Deadline shall automatically be extended without further action by either party for up to an additional one hundred fifty (150) days as may be necessary in connection with Manufacturer and State of California regulatory approvals as required under Section 6.1(c) and Section 6.1(e) below.

(b)    Buyer and Seller acknowledge and agree that all profits, or losses, relating to the Dealerships on the Closing Date shall be the property and responsibility of Buyer.

(c)    The Closing shall be deemed to be completed as of 12:01 a.m. on the applicable Closing Date.

### 3.2    Actions to be Taken at the Closing.  At the Closing, the Parties will take the following actions and deliver the following documents:

(a)    Seller and Buyer will execute and deliver a Bill of Sale, Assignment and Assumption Agreement in the form attached hereto as Exhibit A (the "Bill of Sale").

(b)    Seller will assign to Buyer all of its rights to receive termination assistance from (i) BMW of North America, LLC ("BMW"), with respect to Seller's BMW operations, (ii) Audi of America, Inc. ("Audi"), with respect to Seller's Audi operations, and (iii) Porsche Cars North

4

America, Inc. ("Porsche"), with respect to Seller's Porsche operations. BMW, Audi, and Porsche are sometimes referred to herein as the "Manufacturer".

(c)    Seller will provide evidence of Seller's voluntary termination of its dealer agreements with the applicable Manufacturer as they relate to the Dealerships.

(d)    Christopher J. Wilson (the "Seller Principal") will execute and deliver a non-compete, non-solicitation and no-hire agreement in the form attached hereto as Exhibit B (the "Non-Compete Agreement").

(e)    In the event Seller is not the direct tenant under any of the Leases, Seller and such direct tenant will execute and deliver terminations of any existing subleases or other subtenant occupancy rights relating to the Property (collectively, the "Existing Subleases").

(f)    Seller will deliver to Buyer all consents and approvals (including, without limitation, shareholders', members', managers' and directors' minutes) required for Seller to (i) enter into this Agreement and the Related Agreements and consummate the transactions described herein and therein and (ii) assign the Assumed Contracts, if any, to Buyer.

(g)    Seller will execute and deliver assignments to Buyer of Seller's assignable licenses and permits in form and substance reasonably acceptable to Buyer.

(h)    At or prior to Closing, Buyer shall assign its rights and obligations under this Agreement to the New Buyer Entities.

(i)    The Seller Principal shall have executed and delivered a Subscription Agreement to purchase membership interests in the New Buyer Entities (as defined in Section 9.6) in an amount equal to twenty-five percent (25%) of the aggregate equity investment to be made at Closing (which aggregate equity investment shall be equal to the Purchase Price less any debt incurred by or on behalf of Buyer in connection with the transactions contemplated hereby, including, without limitation, any floorplan financing, term debt financing (including any blue sky loan), and working capital financing) (the "Membership Interests"), which Subscription Agreement shall have been countersigned by the New Buyer Entities, in form and substance reasonably acceptable to Buyer.

(j)    The Seller Principal shall have executed and delivered a joinder agreement to the amended and restated limited liability company agreements of each of the New Buyer Entities (the "LLC Agreements"), in form and substance reasonably acceptable to Buyer. The Seller Principal and Buyer shall mutually agree on the LLC Agreements during the Diligence Period.

(k)    The Seller Principal and Buyer will execute and deliver an employment agreement in the form attached hereto as Exhibit C.

(l)    Possession of the Property shall be delivered to Buyer.

(m)    An assignment and assumption of the Leases, together with the required consents from the landlords under the Leases, or new leases between Buyer and the landlords thereunder, in each case acceptable to Buyer in its sole discretion (the "Lease Assignments");

(n)    Buyer and Seller will deliver to each other closing certificates related to the representations and warranties set forth in this Agreement, organizational matters and authority of the respective Parties to consummate the transactions contemplated under this Agreement.

5

(o)      The Parties will take such other actions and will execute and deliver such other instruments, documents and certificates as are required by the terms of this Agreement and the Related Agreements or as may be reasonably requested by any Party in connection with the consummation of the transactions contemplated herein.

## 4.      REPRESENTATIONS; WARRANTIES.

**4.1      Seller Representations.**  Seller, jointly and severally, represents and warrants to Buyer that the following are true, complete and correct as of the Effective Date and shall be true, complete and correct as of the Closing Date:

(a)      Each entity comprising Seller is a corporation duly incorporated, validly existing and in good standing under the laws of its state of formation.  Seller has full power and lawful authority to (i) own and operate its assets, properties and business, (ii) carry on its business at the Dealerships, (iii) enter into this Agreement and all Related Agreements, and (iv) consummate the transactions contemplated by this Agreement and the Related Agreements.

(b)      This Agreement and the Related Agreements each constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with their terms, subject to the effects of bankruptcy, insolvency, reorganization, arrangement, moratorium, fraudulent conveyance or other similar laws affecting creditors generally.  Seller's execution, delivery and performance of this Agreement and the Related Agreements do not and will not (i) constitute a breach or violation of Seller's articles of incorporation or bylaws, (ii) constitute a breach or violation of any material agreement, indenture, deed of trust, mortgage, loan agreement or any material instrument, by Seller, to which Seller is a party or by which Seller, the Property or any of the Purchased Assets is bound or affected, (iii) constitute a violation of any order, judgment or decree by which Seller, any of the Purchased Assets or the Property is bound or affected, (iv) result in the creation of any lien or charge on the Purchased Assets, (v) result in the acceleration of any material debt owed by Seller, or (vi) except for the consent of those parties to the Assumed Contracts and Leases, require any authorization or consent of any third party.  Notwithstanding anything set forth in this Section 4.1(b), certain consents or waivers will be required by certain of Seller's lenders or landlords in order to consummate the transactions contemplated under this Agreement, as set forth in Schedule 4.1(o).

(c)      Except for the Assumed Contracts, if any, and Leases, Seller has, and at the Closing Buyer will receive, good and marketable title to the Purchased Assets, free and clear of all Encumbrances.  There are no Encumbrances on the leasehold estate or interest created by the Leases.  Seller is not leasing or holding on consignment any of the Purchased Assets.  There are no special assessments against any of the Purchased Assets.  The tangible Purchased Assets are in good working order, ordinary wear and tear excepted.  The Purchased Assets represent all of the assets and occupancy rights materially necessary for the operation of the Dealerships on or after the Closing Date, consistent with the operations of the Dealerships as conducted on the Effective Date.  The Material Agreements (as defined below) represent all of the contractual agreements materially necessary for the operation of the Dealerships as conducted on the Effective Date.  Seller has delivered to Buyer true, correct and complete copies of the Leases as of the Effective Date.

(d)      Except as set forth on Schedule 4.1(d), (i) there is no Person holding any claim of any nature against Seller, including claims arising out of or in connection with the operation of the Dealerships, Seller's obligations under any collective bargaining agreement to which it or any of its affiliates is a party (including, without limitation, the BMW Fresno Collective Bargaining Agreement), or any pension fund trust agreement (and related pension plan rules) to which Seller or any of its affiliates is bound (including, without limitation, the BMW Fresno Pension Fund Trust

6

Agreement), (ii) Seller does not know or have reasonable grounds to know of any dispute which adversely affects, or may adversely affect, the Purchased Assets, the Dealerships, or the Property, (iii) there is no present or threatened walkout, strike or labor disturbance involving any of Seller's employees, (iv) neither Seller, the Purchased Assets nor the Property is subject to any pending or threatened litigation, proceeding or administrative investigation, (v) Seller has not violated any federal, state or local law or ordinance or any rule, regulation order or decree of any governmental agency, court or authority having jurisdiction over it or over any part of its operations or assets, (vi) Seller and its affiliates have made all required contributions to any union pension plans to which it is obligated to make contributions, including, without limitation, the I.A.M. National Pension Plan, (viii) neither Seller nor any member of Seller's controlled group is subject to any withdrawal liability in the event Seller or any of its affiliates withdraws from a multi-employer pension plan, and (ix) Seller has maintained all licenses and permits and has filed all registrations, reports and other documents required by local, state and federal authorities and regulating bodies in connection with the Dealerships, and to the extent such licenses and permits are fully assignable to Buyer, they will have been assigned to Buyer on the Closing Date pursuant to the Bill of Sale or such other method as may be required of Seller under applicable law. As used in this Agreement, "Knowledge of Seller", "Seller's Knowledge", or any other similar knowledge qualification, means the actual knowledge, after making reasonable inquiry of appropriate Dealerships personnel, of the Seller Principal and Ann Zimmerman. As used in this Agreement, "BMW Fresno Collective Bargaining Agreement" means that certain Collective Bargaining Agreement entered into by and between BMW Fresno and Machinist Automotive Trades District Lodge 190 International Association of Machinists and Aerospace Workers. As used in this Agreement, "BMW Fresno Pension Fund Trust Agreement" means that certain Trust Agreement, dated May 1, 1960, as amended, creating the I.A.M. National Pension Plan and the Plan rules adopted by the Trustees of I.A.M. National Pension Fund.

(e)    Attached as Schedule 4.1(e) is a true and correct listing of any and all material written or oral agreements or instruments to which the Dealerships or the Purchased Assets are subject, and any and all related agreements, including, but not limited to, the Assumed Contracts and the Leases, and all leases, subleases, warranty agreements, sales agreements, service agreements, maintenance agreements, dealer or dealership agreements, loan agreements, promissory notes, collective bargaining agreements and partnership agreements (collectively, "Material Agreements"). Seller has delivered to Buyer a true and correct copy of each written instrument and a written summary of any oral agreement existing with respect to the Material Agreements. Each Material Agreement is valid and enforceable in accordance with its terms. Except as disclosed on Schedule 4.1(e), neither Seller nor, to the Knowledge of Seller, any other party thereto is in breach of or in default under any Material Agreement, nor has any notice or claim with respect to any breach or default thereunder been given by Seller or received by Seller.

(f)    Attached as Schedule 4.1(f) is a true and complete list of all employees, independent contractors or consultants of the Dealerships as of September 30, 2018, broken down by location, and their dates of hire or engagement, positions, base compensation and commission and/or bonus schedule (if applicable). Except for the BMW Fresno Collective Bargaining Agreement, Seller does not have, and has not had for the past three (3) years, any collective bargaining or union contracts or agreements and there is no union campaign presently being conducted to solicit employees to authorize a union to request a National Labor Relations Board certification election with respect to any of Seller's employees at the Dealerships. Seller has paid in full to all of its employees or adequately accrued for all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such employees.

(g)      Attached as Schedule 4.1(g) is a true and complete list of the types of tax returns (e.g., income, sales and use) that Seller has filed in the past three (3) years.  Seller has (i) filed, when due, with all appropriate governmental agencies, all tax returns, estimates, reports and statements required to be filed by it, all of which are true and correct in all material respects, and (ii) paid, when due and payable, all requisite income taxes, sales, use, property and transfer taxes, levies, duties, licenses and registration fees and charges of any nature whatsoever and workers' compensation and unemployment taxes, including interest and penalties thereon.  Seller has withheld all tax required to be withheld under applicable tax laws and regulations.  Seller has not waived any statute of limitations in respect of taxes or agreed to any extension of time with respect to a tax assessment or deficiency.  No adjustments relating to such tax returns has been proposed formally or informally by any governmental authority (insofar as either relates to the activities or income of Seller or could result in a liability of Seller on the basis of joint and/or several liability) and, to the Knowledge of Seller, no basis exists for any such adjustment.  No claim has ever been made by a governmental authority in a jurisdiction where Seller does not file tax returns that Seller may be subject to taxation in that jurisdiction, and Seller has not conducted operations in jurisdictions other than California or created a taxing nexus with any jurisdiction other than California.

(h)      Attached as Schedule 4.1(h) is a list of each Existing Sublease.  Seller enjoys and has the right to peaceful and undisturbed possession of the Property subject to the terms and provisions of the Existing Subleases.  Except as set forth on Schedule 4.1(h), Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy the Property or any portion thereof.  Seller's operations on the Property, including improvements thereon, do not violate any applicable building code, zoning requirement or classification, or pollution control ordinance or statute relating to the Property or to such operations, or any other applicable law, regulation or ordinance.  The use and operation of the Property in the conduct of the Business of Seller does not violate in any material respect any covenant, condition, restriction, easement, license, permit or agreement.  Seller has all licenses and permits necessary to own and operate the Dealerships.  There are no liens or other encumbrances on the leasehold estate or interest created by any Existing Sublease.  As used in this Agreement, "Business" means the ownership and operation of the Dealerships.

(i)      Except as disclosed in Schedule 4.1(i) to Buyer by Seller, the Property, the use thereof, and any operations now or heretofore conducted at the Property, are, and have been, so long as Seller has occupied the Property, to the best Knowledge of Seller, in compliance with all applicable Environmental Laws (as hereinafter defined); all federal, state and local permits, licenses, registrations and authorizations required for the use of and operations at the Property have been obtained and, further, there are currently no violations of such permits, licenses, registrations or authorizations; there are no claimed, alleged or threatened violations of or liabilities under any Environmental Laws with respect to the Property, nor are there any present or planned discussions or negotiations with any agency regarding the release of any Hazardous Substances (as hereinafter defined), and the Property has not been used for the treatment, storage or disposal of any Hazardous Substances as such treatment, storage or disposal may be regulated under the Resource Conservation and Recovery Act, 42 U.S.C. 6901 *et seq*. or its state counterparts, as amended and/or reauthorized, and regulations promulgated thereunder.  None of the following exists at any of the Property locations: (i) underground storage tanks, (ii) asbestos-containing material in any form or condition, (iii) materials or equipment containing polychlorinated biphenyls, (iv) groundwater monitoring wells, drinking water wells, or production water wells, or (v) landfills, surface impoundments, or disposal areas.  To the Knowledge of Seller, neither this Agreement nor the consummation of the transactions contemplated hereby will result in any obligations for site investigation or cleanup, or notification to or consent of government agencies or third parties,

pursuant to any applicable Environmental Laws, including the so-called "transaction-triggered" or "responsible party transfer" Environmental Laws.

"Environmental Laws" means all federal, state and local laws, whether common laws, court or administrative decisions, statutes, rules, regulations, ordinances, court orders and decrees, and administrative orders and all administrative policies and guidelines concerning action levels of a governmental authority (federal, state or local) now or hereafter in effect relating to the environment, public health, occupational safety, industrial hygiene, any Hazardous Substance (including, without limitation, the disposal, generation, manufacture, presence, processing, production, release, storage, transportation, treatment or use thereof), or the environmental conditions on, under or about the Property, as amended and as in effect from time to time (including, without limitation, the following statutes and all regulations thereunder as amended and in effect from time to time:  the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq*.; the Superfund Amendments and Reauthorization Act of 1986, Title III, 42 U.S.C. §§ 11001, *et seq*.; the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*.; the Safe Drinking Water Act, 42 U.S.C. §§ 300(f), *et seq*.; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, *et seq*.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §§ 1801, *et seq*.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §§ 6901, *et seq.;* the Federal Water Pollution Control Act, as amended, 33 U.S.C. §§ 1251, *et seq*.; the Toxic Substances Control Act of 1976, 15 U.S.C. §§ 2601, *et seq*.; and the Occupational Safety and Health Act, 29 U.S.C. §§ 651, *et seq*.; and any successor statutes and regulations to the foregoing.

"Hazardous Substances" means (I) all chemicals, materials and substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar import, under any applicable Environmental Law; and (II) all other chemicals, materials and substances, exposure to which is prohibited, limited or regulated by any governmental authority, including, without limitation, asbestos and asbestos-containing materials in any form, lead-based paint, radioactive materials, polychlorinated biphenyls ("PCB's"), and substances and compounds containing PCB's.

(j)        Attached as Schedule 4.1(j) is a list of each Employee Benefit Plan (as defined below) of Seller.  Each Employee Benefit Plan of Seller and each related trust, insurance contract, or fund, has been maintained in material compliance with all applicable laws, including, but not limited to, ERISA, and the Internal Revenue Code of 1986, as amended (the "Code").  To the extent any such Employee Benefit Plan is not in material compliance with all applicable laws, such noncompliance is not material with respect to the transactions contemplated hereunder.  "Employee Benefit Plan" means an "employee benefit plan," within the meaning of Section 3(3) of ERISA, and which is currently maintained by Seller.  Each Employee Benefit Plan of Seller is in writing and the Buyer has been furnished a complete and accurate copy of such Employee Benefit Plan, any amendments to such Employee Benefit Plan, and a complete and accurate copy of each material document prepared in connection with each Employee Benefit Plan.  There are no other employee benefit plans, programs, arrangements, perquisites or agreements, whether formal or informal, whether in writing or not, to which Seller is a party, with respect to which Seller has any obligation or which are maintained, contributed to or sponsored by Seller for the benefit of any current or former employee, independent contractor, officer, manager or director of Seller.

(k)        Except for the matters disclosed on Schedule 4.1(k), Seller will have sufficient assets to pay, and will pay, all amounts owing to the creditors of Seller outstanding as of the Closing Date for all obligations not assumed by Buyer.

(l)        Attached hereto as <u>Schedule 4.1(l)</u> is a list of all the financial statements Seller has delivered to Buyer (collectively the "<u>Financial Statements</u>"). The Financial Statements (including the notes thereto) have been prepared in accordance with applicable Manufacturer accounting principles applied on a consistent basis throughout the periods covered thereby, present fairly and accurately the financial condition of the Seller as of such dates and the results of operations of Seller for such periods, are correct and complete, and are consistent with the historical books and records of Seller (which books and records are correct and complete).  Except as set forth on <u>Schedule 4.1(l)</u>, there has been no material adverse change in the business, financial condition, operating results, assets, employee, customer, vendor or supplier relations of Seller relating to the Dealerships.

(m)        All material assets, properties and risks of Seller are, and for the past five (5) years have been, covered by valid and, except for insurance policies that have expired under their terms in the ordinary course, currently effective insurance policies or binders of insurance (including general liability insurance, property insurance and workers' compensation insurance) issued in favor of Seller, in such types and amounts and covering such risks as are consistent with customary practices and standards of companies engaged in businesses and operations similar to those of Seller, as the case may be. To Knowledge of Seller, with respect to each insurance policy: (A) the policy is legal, valid, binding, enforceable, and in full force and effect; (B) the policy will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby; (C) Seller is not, nor is any other party to the policy, in breach or default (including with respect to the payment of premiums or the giving of notices), and no event has occurred that, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the policy; and (D) no party to the policy has repudiated any provision thereof. Seller has been covered during the past five (5) years by insurance in scope and amount reasonably equivalent to what is maintained by Seller as of the Effective Date.  Attached as <u>Schedule 4.1(m)</u> is a list of all insurance policies of Seller in effect as of the Effective Date.

(n)        Seller either owns or is otherwise entitled to use all Proprietary Rights (as defined below) necessary to conduct the business of the Dealerships as presently conducted.  For purposes of this Agreement, "<u>Proprietary Rights</u>" means all (i) patents, patent applications, patent disclosures and improvements thereto, (ii) trademarks, service marks, trade dress, logos, trade names and corporate names and registrations and applications for registration thereof, (iii) copyrights and registrations and applications for registration thereof, (iv) mask works and registrations and applications for registration thereof, (v) computer software data and documentation, (vi) trade secrets and confidential business information (including ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information), (vii) other proprietary rights or any intellectual property, and (viii) copies and tangible embodiments thereof (in whatever form or medium).  Attached as <u>Schedule 4.1(n)</u> is a list of all Seller Proprietary Rights.

(o)        Except as set forth on <u>Schedule 4.1(o)</u>, no permit, consent, approval or authorization of, or declaration or notice to, or report or filing with, any governmental or regulatory authority or any other Person is required in connection with the execution, delivery or performance of this Agreement or any Related Agreement by Seller or the consummation by Seller of any other transaction contemplated hereby or thereby. Upon completion of <u>Schedule 1.3</u> (Assumed

10

Contracts), Seller shall update Schedule 4.1(o) to enumerate which Assumed Contracts require consent to be assigned.

(p)     Except as set forth on Schedule 4.1(p), Seller has no liability (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product manufactured, sold, leased, or delivered by Seller.

(q)     Except as set forth on Schedule 4.1(q), and except for notices which are no longer applicable, no Manufacturer has: (i) notified Seller of any deficiency in dealership operation, including, but not limited to, the following areas: (a) brand imaging, or (b) facility conditions;  (ii) otherwise advised Seller of a present or future need for facility improvement or upgrades in connection with Seller's business; (iii) notified Seller of its intent or desire to relocate the location of or close the applicable Dealership; (iv) notified Seller of its intent to relocate any other dealership or establish or award a new franchise for a dealership to a location that could have a material adverse impact on the applicable Dealership; (v) protested any action taken or proposed to be taken by the applicable Dealership; or (vi) notified Seller of any Manufacturer chargebacks.  Seller has not been assessed any material chargebacks relating to any Manufacturer audit matters, including, but not limited to, matters related to the export of motor vehicles in violation of Manufacturer policies.  As of the Effective Date, the Dealership sites identified in Recital A to this Agreement are operated in material compliance with applicable Manufacturer image requirements.  Seller has not received any written notice from a Manufacturer concerning open point opportunities, Manufacturer market realignments, or any other actions within a 200 mile radius of any Dealership that could reasonably be expected to have an effect on the Business of Seller and operations of the Dealerships of Seller.  Seller has operated the Dealerships in compliance with applicable Manufacturer warranty and leasing guidelines other than as disclosed in writing to Buyer.  Seller has disclosed to Buyer all active Manufacturer programs available credits to Buyer in connection with the operation of the Dealerships.

(r)     Neither this Agreement, nor any Related Agreement, Schedule or other document, certificate or item delivered by Seller or at Seller's direction pursuant to this Agreement, or any Related Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary to make each statement contained herein or therein not misleading.  There is no fact which has not been disclosed to Buyer of which Seller is aware and which has a material adverse effect on the business, financial condition, operating results, assets or employee, customer or supplier relations of Seller relating to the Dealerships.

(s)     Schedule 4.1(s) contains a complete list of all names by which Seller, or any of Seller's related predecessors-in-interest, if applicable, have conducted business.

(t)     Except as set forth on Schedule 4.1(t), in the last five (5) years, Seller has not participated, and currently does not participate, in customer marketing plans such as "tires for life", "batteries for life", "lifetime oil changes", "lifetime warranties", customer coupon programs, or similar programs.

(u)     To the Knowledge of Seller, except as set forth on Schedule 4.1(u), none of the New Vehicles (as defined in Schedule 1.1) to be conveyed hereby has sustained prior mechanical trouble or body damage such that the applicable Dealership is required under California law to make a disclosure to a customer.

(v)     To the best Knowledge of Seller, Seller has complied with the Gramm-Leach-Bliley Act with respect to customer information received by Seller, including, if applicable, responsibility for providing any notice required, and Seller has implemented and maintained privacy practices to protect any financial information received by Seller from its customers.

(w)     To the Knowledge of Seller, neither it nor any of its respective directors, members, officers, agents, representatives or employees (in their capacity as directors, members, officers, agents, representatives or employees) has: (A) used any funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity in respect of the Business of Seller; (B) directly or indirectly, paid or delivered any fee, commission or other sum of money or item of property, however characterized, to any finder, agent, or other party acting on behalf of or under the auspices of a governmental official or governmental authority, in the United States or any other country, which is in any manner illegal under any law of the United States or any other country having jurisdiction; or (C) made any payment to any customer or supplier of Seller or any officer, director, partner, employee or agent of any such customer or supplier of Seller for any unlawful reciprocal practice, or made any other unlawful payment or given any other unlawful consideration to any such customer or supplier of Seller or any such officer, director, partner, employee or agent of any such customer or supplier of Seller, in respect of the Business of Seller.

(x)     Seller has taken all commercially reasonable steps to safeguard the information technology systems utilized in the operation of the Business of Seller, including the implementation of procedures to reasonably ensure that such information technology systems are free from disabling codes or instructions, timer, copy protection device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus," or other software routines or hardware components, which in each case may permit unauthorized access or the unauthorized disablement or unauthorized erasure of data or other software by a third party and, to the Knowledge of Seller, to date there have been no successful unauthorized intrusions or breaches of the security of the information technology systems.  Seller has complied with and, as the Business of Seller is presently conducted, is in compliance in all material respects with, all data laws, rules and regulations.  Seller has complied in all material respects with, and is presently in compliance in all material respects with, its policies applicable to data privacy, data security, and/or personal information as well customer collection practices in compliance with the Fair Credit Reporting Act and any Consumer Finance Protection Bureau policies or regulations.  Seller has not experienced any incident in which personal information or other data was or may have been stolen or improperly accessed.  Seller is not aware of any facts suggesting the likelihood of the foregoing, including without limitation, any breach of security or receipt of any notices or complaints from any Person regarding personal information or other data.

(y)     Except as set forth in Schedule 4.1(y), since January 1, 2018, the Business of Seller has been conducted in the ordinary course and consistent with past practice.  Except as set forth in Schedule 4.1(y), since January 1, 2018, Seller has not:

(i)     permitted or allowed any of the Purchased Assets to be subjected to any encumbrance, other than floorplan inventory encumbrances;

(ii)     made any change in any method of accounting or accounting practice or policy used by Seller, other than such changes required by GAAP;

(iii)     amended, terminated, cancelled or compromised any material claims of Seller or waived any other rights of substantial value to Seller;

12

(iv)    made any capital expenditure or commitment for any capital expenditure in excess of $50,000 individually or $100,000 in the aggregate;

(v)    failed to pay any creditor any amount owed to such creditor when due;

(vi)    made any material changes in the customary or historic methods of operations of Seller, including practices or policies relating to purchasing, maintaining inventories, extending payables, accelerating receivables, marketing, selling and pricing;

(vii)    entered into any agreement, arrangement or transaction with Seller's directors, officers, employees, members or managers (or with any relative, beneficiary, spouse or Affiliate of such Persons);

(viii)    suffered any casualty loss or damage with respect to any of the Purchased Assets which in the aggregate have a replacement cost of more than $100,000, if such loss or damage is not covered by insurance; or

(ix)    threatened or filed claims or litigation which could reasonably be expected to result in a material adverse effect on Seller.

(z)    Except as set forth in Schedule 4.1(z), Seller has no liabilities other than liabilities (i) reflected or reserved against on the Financial Statements or expenses related to the transactions contemplated under this Agreement, or (ii) incurred since January 1, 2018, consistent with past practice of Seller, and which do not and could not have a material adverse effect on Seller.

**4.2    Buyer Representations.**  Buyer represents and warrants to Seller as follows:

(a)    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.  As of the Closing Date, Buyer (or its permitted assignee) will be qualified to do business in the State of California.  Buyer has the full power and lawful authority to (i) enter into this Agreement and the Related Agreements and (ii) to consummate the transactions contemplated by this Agreement and the Related Agreements.

(b)    Prior to the Closing, this Agreement and each Related Agreement will have been duly authorized by all necessary member or manager action on the part of Buyer.  This Agreement and the Related Agreements each constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

**4.3    Mutual Representations and Warranties.**

(a)    Seller engaged Templeton Marsh ("Broker") as a broker in this transaction. For these services, Seller shall pay to Broker, at the Closing, all amounts due to Broker in connection with the consummation of the transactions contemplated by this Agreement.  Except for Seller's engagement of Broker, Seller and Buyer each hereby represents and warrants to the other that its sole contact with the other or with the Purchased Assets and the Property has been made without the assistance of any broker or other third party and that no fees are payable to any broker or third party in connection with the consummation of the transactions contemplated by this Agreement. Buyer and Seller shall each indemnify, defend and hold the other Party, each Affiliate of such Party, and their respective members, partners, venturers, directors, officers, stockholders, agents, employees, spouses, legal representatives, successors and assigns, harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, or losses (including, without limitation, reasonable attorneys' fees) resulting from the breach by the indemnifying Party of the

13

representation and warranty set forth above in this Section 4.3(a) or for any action by such Party's representative for payment or commissions.  The mutual representations and warranty contained in this Section 4.3(a) will survive the Closing.

(b)    Seller and Buyer each hereby represents to the other that the inclusion of all of the Purchased Assets, including but not limited to all of the goodwill associated with, and assets used in the operation of, all of the Dealerships, in the transactions contemplated herein is a material inducement for such Party to enter into this Agreement.  The removal of any Purchased Asset from the transactions contemplated herein would negate the intent of the Parties hereto and render this Agreement void in its entirety.

4.4    **Schedules.**  The Schedules provided under Section 4.1 shall be annexed and incorporated into this Agreement as if delivered on the Effective Date with no further action required by the Parties. Within ten (10) days of the Effective Date, Seller shall prepare and deliver to Buyer all Schedules to this Agreement.  All Schedules shall be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Agreement.  Without limiting the foregoing, each Schedule shall identify with particularity and describe in relevant detail all relevant facts to be described thereunder; the listing of (or inclusion of a copy) of a document or other item shall be deemed adequate to disclose an exception to a representation or warranty made by Seller herein provided that Seller has provided Buyer with a complete copy of the document (unless the representation or warranty has to do with the existence of the document or other item itself).  The date the Schedules have been delivered in full compliance with this Section 4.4 shall be the "Schedule Delivery Date".

4.5    **Survival.**  The representations and warranties of the Parties contained in Section 4.1 and Section 4.2 shall survive the Closing for a period of twenty-four (24) months; provided, however, that the representations and warranties under Section 4.1(a) and Section 4.1(c) shall survive indefinitely, and the representations and warranties under Section 4.1(g), Section 4.1(i) and Section 4.1(j) shall survive for a period of time equal to ninety (90) days after the completion of the applicable statute of limitations (giving effect to any waiver, mitigation or extension thereof) for the subject matter laws relating to such representations and warranties.  No claim for indemnification pursuant to Section 5.3 may be asserted after the date on which such representation or warranty expires except to the extent that such claim is based upon fraud or willful misconduct of the Party making such representation and warranty, in which case it may be asserted at any time prior to the expiration of the statute of limitations applicable thereto.

5.    **CERTAIN COVENANTS.**

5.1    **Access to Property and Records; Inspection.**  For a period of sixty (60) days following the Schedule Delivery Date (the "Diligence Period"), upon reasonable notice to Seller, Buyer and its counsel, accountants and other representatives will be given full and complete access during normal business hours to all of the properties, personnel contracts, commitments, employee files and other information and records of Seller, including, without limitation, such access as is needed to (a) conduct a physical and environmental inspection of the Property satisfactory to Buyer, (b) with the prior approval of Seller, which may not be unreasonably withheld or delayed, evaluate and interview employees, and (c) jointly with Seller, as set forth herein, determine the Purchase Price of the Purchased Assets.  Seller shall also make available appropriate accountants, legal counsel, and other agents and representatives of Seller not employed by Seller or located at the Property.  Buyer shall have the right to have its diligence review updated following the expiration of the Diligence Period and prior to the Closing to ensure there was no material change in the operation of the Dealerships prior to the Closing.  In addition to the foregoing, Buyer's computer consultants and parts and service personnel will be provided full access to the Dealerships, including, with the prior approval of Seller, which may not be unreasonably withheld, all personnel of Seller at or related to the Dealerships, at least two (2) weeks prior to Closing.  Seller will, and

will cause all of its in-house and outside accountants, counsel and other personnel to, fully cooperate with Buyer, Buyer's Affiliates and its counsel, accountants and other representatives and to fully support all actions contemplated by this Section 5.1, including Buyer's evaluation and analysis of the above-referenced material.  Buyer shall have the right to terminate this Agreement for any reason during the Diligence Period upon written notice to Seller.

**5.2** **Operation of Dealerships.**  Between the Effective Date and the Closing Date, Seller will: (a) operate its business in the ordinary course; (b) use its best efforts to preserve its Dealerships' operations so that Buyer will obtain the benefits intended to be afforded by this Agreement; (c) not take or permit any action which would result in any representation or warranty of Seller becoming incorrect or untrue in any respect; (d) obtain the prior written approval of Buyer in connection with all material decisions affecting the business, operations, assets and liabilities of the Dealerships; and (e) notify Buyer in writing promptly after Seller becomes aware of the occurrence of any event that might result in any of Seller's statements, representations and warranties under this Agreement or any Related Agreement being or becoming untrue. Seller shall keep all ratios, including, but not limited to inventory levels, in accordance with a 12-month rolling average.  Seller shall not enter into any agreements from and after the Effective Date which have a during in excess of 30 days, or which cannot be cancelled by Seller upon 30 days' prior written notice without penalty or cost.  Seller shall not enter into any agreement from and after the Effective Date which has a capital cost to Seller in excess of Ten Thousand Dollars ($10,000) without the prior consent of Buyer. Seller shall maintain all insurance policies in existence as of the Effective Date in force, current, and fully paid.

**5.3** **Indemnification**.

(a)      Seller will indemnify, defend and hold Buyer, its Affiliates (as defined below) and their respective members, partners, venturers, stockholders, directors, officers, employees, spouses, legal representatives, agents, successors and assigns (the "Buyer Indemnified Parties") harmless from and against any and all claims, judgments, damages, penalties, fines, costs, liabilities, losses or expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by the Buyer Indemnified Parties (collectively, "Losses") arising from or directly or indirectly relating to:

(i)      any breach or non-fulfillment by Seller of any term, covenant or provision of this Agreement or any Related Agreement, including, but not limited to, any representation and warranty set forth in Section 4.1 of this Agreement;

(ii)      any Excluded Asset;

(iii)      Seller's operation of the Dealerships prior to the Closing Date, including, but not limited to, Seller's Obligations (as defined in Section 1.3), any Seller tax liabilities accruing prior to the Closing Date, any refunds issued by Buyer or its Affiliates (including any Seller profit component) as a result of any cancellations of any service warranties or insurance products, and any liabilities to employees of the Dealerships or any union pension fund, including, without limitation, the I.A.M. National Pension Fund, that arise as a result of actions or omissions of Seller prior to the Closing Date; or

(iv)      withdrawal liability assessed against Seller or any member of Seller's controlled group arising from a withdrawal from a multi-employer pension plan, including without limitation, the I.A.M. National Pension Fund, arising out of or related to this transaction.

"Affiliate" of any Person (as hereinafter defined) means any Person that controls, is controlled by or is under common control with such Person, together with its and their respective members, partners, venturers, directors, officers, stockholders, agents, employees and spouses. A Person shall be presumed to have control when it possesses the power, directly or indirectly, to direct, or cause the direction of, the management or policies of another Person, whether through ownership of voting securities, by contract, or otherwise. "Person" means an individual, partnership, limited liability company, association, corporation, or other entity.

(b)   Buyer will indemnify, defend and hold Seller, its Affiliates and their respective members, partners, venturers, stockholders, directors, officers, employees, spouses, legal representatives, agents, successors and assigns (the "Seller Indemnified Parties") harmless from and against any and all Losses incurred by the Seller Indemnified Parties arising from or directly or indirectly relating to:

(i)   any breach or non-fulfillment by Buyer of any term, covenant or provision of this Agreement or any Related Agreement, including, but not limited to, any representation and warranty set forth in Section 4.2 of this Agreement; or

(ii)   Buyer's operation of the Dealerships on and after the Closing Date.

(c)   If any claim is made against a Party which, if sustained, would give rise to a liability of the other hereunder, the Party seeking indemnification (the "claiming party") shall, as soon as practicable, cause notice of the claim to be delivered to the other Party (the "non-claiming party") and shall afford the non-claiming party and its counsel, at its sole expense, the opportunity to defend or settle the claim (provided that the claiming party and its counsel may participate at their sole cost and expense). Any notice of a claim shall state specifically the representations, warranty, covenant or agreement with the alleged basis for the claim, and the amount of liability asserted against the other Party by reason of the claim. If such notice and opportunity are not given, or if any claim is compromised or settled without notice to and consent of the non-claiming party, no liability shall be imposed on the non-claiming party by reason of such claim; but if notice is given and the non-claiming party receiving the notice fails to assume the defense of the claim or fails to admit in writing its responsibility as between the Parties to this Agreement with respect to such claim, the claim may be defended, compromised or settled by the claiming party without its consent and the non-claiming party shall remain liable hereunder. Notwithstanding anything contained herein to the contrary, the claiming party may retain control over the defense of any claim hereunder if such claim is non-monetary or is for injunctive or other equitable relief.

(d)   If Seller receives notice from Buyer of a request for indemnification and Seller does not dispute its indemnification obligation in connection therewith, Buyer may, at its sole option, only after complying with the procedure described herein, set-off such amounts owing Buyer in respect of such indemnification obligation from any distributions due to the Seller Principal under the LLC Agreements. Prior to exercising its right of set-off hereunder, Buyer shall notify Seller in writing of the matter in dispute together with all material facts and circumstances reasonably necessary for Seller to determine the basis for such claim or asserted obligation. If, after receiving such written notice, Seller agrees that such claim is valid, offset may be made against the distributions to Seller Principal as stated above. If Seller disputes such claim, Seller shall notify Buyer of such dispute in writing, including the basis therefor, and the New Buyer Entities shall continue to hold said distributions in escrow pending resolution of the matter by the Parties. The prevailing party in such dispute shall be entitled to recover from the non-prevailing party the reasonable attorney's fees and costs incurred in any proceeding instituted to resolve such dispute. Buyer shall have the option, in its sole discretion, to seek all or any portion of the amounts owed

in respect of Seller's indemnification obligation directly from Seller rather than exercising its set-off rights hereunder.

(e)    Subject to the limits contained herein, the foregoing indemnification provisions are in addition to, and not in derogation of, any statutory, equitable, or common law remedy any Party may have with respect to the transactions contemplated by this Agreement.

(f)    For purposes of this Section 5.3, any inaccuracy in or breach of any representation or warranty shall be determined with regard to any materiality or similar qualification contained in or otherwise applicable to such representation or warranty contained herein; provided, however, upon establishment of such inaccuracy or breach a Buyer Indemnified Party or Seller Indemnified Party, as applicable, shall be entitled to recovery of its Losses in accordance with this Section 5.3 irrespective of the materiality of such Losses.

5.4    **Notices.**  Buyer and Seller will promptly notify the other in writing if it receives any notice, or otherwise becomes aware, of any action or proceeding instituted or threatened before any court or governmental agency by any third party to restrain or prohibit, or obtain substantial damages in respect of, this Agreement or any Related Agreement or the consummation of the transactions contemplated by such agreements.

5.5    **Employees and Employee Benefits**.

(a)    For purposes of this Section 5.5, the term "Employee" shall mean an individual who, immediately prior to the Closing Date, is included on Seller's payroll records as a common law employee, including but not limited to any such individual who is on a leave of absence or otherwise not actively working on the Closing Date.  On the Closing Date, Seller shall terminate all of its Employees.  At the time of termination, Seller will pay to such Employees all vacation, sick leave, PTO and other similar benefits, which are accrued and unpaid, to which they are entitled with respect to their employment up to the Closing Date, including all salary and wages due on the date of termination, bonuses and incentives, and all other employee benefits to which said employees are entitled at the time of their termination.  Seller shall provide each terminated Employee with a notice in accordance with applicable laws.

(b)    From the date of this Agreement through the Closing Date, Seller will not amend the pay plans in place at the Dealerships as of the date of this Agreement relating to any of its employees, except only for (i) wage increases required by applicable law; (ii) pay plan amendments to which Seller committed prior to the date of this Agreement and which are disclosed on Schedule 4.1(f) hereto; or (iii) short term Seller sponsored incentive plans.

(c)    Subject to the last sentence of this Section 5.5(c), Buyer may, in its sole discretion, offer employment to certain employees of Seller as of the Closing Date on terms and conditions set by Buyer in its sole discretion.  All such persons so employed by Buyer will be considered as "new hires" by Buyer.  Employees who accept employment with Buyer shall be referred to as "Retained Employees."  If, as of the Closing Date, an Employee is on a leave of absence or vacation granted by Seller, Buyer's offer of employment shall allow the Employee to remain on a leave of absence or vacation on substantially the same terms as applied prior to the Closing Date.  All Employee records shall be retained by Seller subsequent to the Closing Date.  Buyer shall be entitled to request copies of the records of Retained Employees.  Notwithstanding anything set forth above, Buyer will rehire the applicable number of employees at the Dealerships to meet the exclusion requirements for compliance with the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. Sections 2101-2109, or the applicable state equivalent that is applicable.

17

(d)      Buyer will not assume or be deemed to have assumed any past or future obligations of Seller to Retained Employees, or any employees of Seller who are not hired by Buyer. Nothing in Section 5.5, expressed or implied, shall limit Seller's right to terminate the employment before the Closing Date of any Employee as it may deem reasonable in the normal operation of its business.

**5.6      Benefit Plans**.

(a)      Effective as of the close of business on the last day of the month that the Closing Date occurs, coverage for all Retained Employees and their covered dependents under Seller's health care programs (the "Health Care Plans"), including all plans subject to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), shall terminate.

(b)      Seller shall retain the responsibility for providing payment of all (i) claims of Seller's employees under any Employee Benefit Plan for claims incurred prior to the Closing Date, and (ii) claims incurred under any life insurance plans for deaths prior to the Closing Date. With respect to Seller's Health Care Plans, effective as of the close of business on the date immediately prior to the Closing Date, coverage for all Employees who are not Retained Employees and their covered dependents under the Health Care Plans shall terminate. Any claim or expense incurred by an Employee or a covered dependent prior to the Closing Date shall continue to be the responsibility of Seller's Health Care Plans in accordance with their terms. Seller agrees to appropriately notify all Employees of the manner in which expenses prior to the Closing Date are to be submitted to the Seller's Health Care Plans for reimbursement. Seller agrees to timely provide the applicable COBRA notices with respect to the Health Care Plans.

**5.7      Consents and Approvals**.

(a)      Seller will obtain prior to Closing, in writing and without penalty to or payment by Buyer, all necessary approvals and consents required for Seller to authorize, approve and execute this Agreement and the Related Agreements and to consummate (i) the assignment to Buyer of the Assumed Contracts, if any, and the Leases, and (ii) the sale of the Purchased Assets to Buyer.

(b)      Buyer will use its commercially reasonable efforts to obtain, no later than the Closing Date, (i) all necessary approvals from the Manufacturers to operate as a retail sales and service dealer, (ii) all necessary approvals from the State of California and any regulatory body thereof to serve as a new and used automotive dealer under California law, and (iii) all necessary permits and approvals from the State of California and any local regulatory body thereof to operate the Dealerships under California, or applicable local, law. Buyer will provide the Manufacturers, federal regulatory bodies and the State of California and any local regulatory body thereof with any and all information necessary to procure such approvals. Seller shall provide its best efforts to assist Buyer's efforts under this Section 5.7(b). Notwithstanding the foregoing, if one or more of the Manufacturers exercises its right of first refusal or option to purchase the applicable Dealership and the associated Purchased Assets, then, either: (1) with the consent of both Buyer and Seller, Buyer will purchase the remaining Dealerships and Purchased Assets at new negotiated purchase prices if mutually agreed to by Buyer and Seller; or (2) this Agreement will be terminated.

**5.8      Vehicle Inventories.**  Seller shall not engage in any inventory adjustments, inter-company movement or dealer trades of new or used vehicles that is outside the ordinary course of its historical practices prior to the Closing Date and shall use its commercially reasonable best efforts to not increase inventory levels or floorplan expenditure at the Dealerships.

**5.9      Run Out of Books; Post Closing Seller Computer Access.**

18

(a)	Buyer will cooperate with Seller in the maintenance of Seller's accounting records for a period twelve (12) months following the Closing Date (the "Run Out Period"). To reasonably ensure Seller's accounting records are accurately stated for the Run Out Period, Buyer will turn over to Seller all payments, mail, invoices, general correspondence, and any other business-related items ("Residual Transactions") related to Seller's business operations prior to the Closing Date received by Buyer.  Buyer and Seller will also work closely to ensure that all Residual Transactions between Buyer and Seller will be reconciled, reviewed, and settled on a weekly basis for the first month, on a bi-weekly basis for the second month, and on a monthly basis thereafter during the Run Out Period.  Buyer's obligations under this Section 5.9 shall be a courtesy to Seller, and any costs incurred by Buyer in compliance shall be de minimus in nature, and Seller shall not request that Buyer provide substantial time and effort to Seller under this Section 5.9.  Furthermore, Seller shall make available to Buyer for the Run Out Period access to personnel and systems not present at the Property in order to achieve a smooth and timely transition of operations for Buyer, at no charge.

(b)	Seller agrees to deliver to Buyer on the Closing Date the Records (as defined on Schedule 1.1) in their "as-is" condition.  To the extent the Records are in a digital form, Buyer and Seller acknowledge and understand that the transfer of a copy of a digital form of the Records involves a joint and collaborative effort of the parties along with the Seller's DMS (Dealership Management System) vendor and requires the cooperation of the Parties and the vendor.  Seller agrees to contact its DMS vendor and arrange for the transfer of a copy of its Records that are in digital form on its DMS to Buyer on or before the Closing, through transfer of a copy of the Records to a location of Buyer's choice, it being contemplated that Buyer shall have all necessary access to these Records immediately after the Closing.  Should Buyer obtain access to the Records prior to the Closing, Buyer shall hold the Records subject to Section 5.15.  In the event the transactions contemplated by this Agreement do not close, any Records in Buyer's possession or control shall be destroyed and Buyer shall be enjoined from using or disclosing the Records or information learned therefrom for any purpose.  Buyer shall pay the cost chargeable to Seller by its DMS vendor for transfer of the Records.  Furthermore, subsequent to the Closing Date, Buyer and its Affiliates shall be permitted access to Seller's computer system in order to obtain Dealership records purchased as part of the transactions under this Agreement.  Seller shall cooperate with Buyer to provide downloads of Dealership financial information necessary for Buyer to establish its books as of the Closing Date.  Buyer's access as contemplated under this Section 5.9(b) shall be upon reasonable notice and shall not unreasonably utilize Seller employees after the Closing.  Seller shall cooperate in good faith to provide the information and access contemplated under this Section 5.9(b).

**5.10	Access to Records.**  For so long as is required by the applicable state or federal law, Seller shall have access to any records transferred to Buyer in connection with this transaction.  Such access shall be limited to reasonable intervals during normal business hours, and shall be for bona-fide, non-competitive business purposes only.

**5.11	Sales Tax.**  To the extent such letters or notices are available from the State of California, Seller will obtain, and deliver to Buyer, a sales tax clearance letter or notification from the taxing authority of the State of California responsible for the collection of sales and use taxes indicating that all such taxes have been reported, collected, and remitted in accordance with the applicable tax laws of the State of California.

**5.12	Health Care Continuation Coverage.**  Seller shall retain the responsibility for providing employees who experience "qualifying events" prior to the Closing Date and their dependents ("Qualified Beneficiaries," within the meaning of COBRA) with the opportunity for continuation of group health care

coverage required by COBRA. For purposes of this provision, references to COBRA (as set forth within the Code and ERISA) shall include references to any provision of such statutes as they may be amended from time to time.

**5.13    Non-Solicitation; Exclusivity**. Seller and the Seller Principal will not directly or indirectly solicit or encourage any inquiries or proposals from (or enter into any agreements with) any Person other than Buyer for the purchase of the capital stock or other equity of Seller, the Purchased Assets or the Property and will not assign the Assumed Contracts or the Leases, or enter into discussions with, or furnish any non-public information concerning Seller, its assets or business, to any such other Person in connection with such proposal, until this Agreement is terminated. Seller shall promptly notify Buyer of any such proposal or inquiry received by Seller or any of its representatives.

**5.14    Confidentiality.** From and after the Effective Date, each of the Parties to this Agreement shall, and shall cause its Affiliates and its or their respective representatives and agents, to hold, in confidence, any and all information, whether written or oral, concerning the transactions contemplated under this Agreement, except (i) the disclosure that a transaction is occurring, but not any specific deal or economic terms, and (ii) to the extent that Party can show that such information (a) is generally available to and known by the public through no fault of the disclosing Party, any of its Affiliates or its or their respective representatives and agents; or (b) is lawfully acquired by the disclosing Party, any of its Affiliates or its or their respective representatives and agents from and after the Effective Date from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If any Party or any of its Affiliates or their respective representatives and agents are compelled to disclose any information by judicial or administrative process or by other requirements of applicable law, such party shall promptly notify the other Parties to this Agreement in writing and shall disclose only that portion of such information which such disclosing Party is advised by its counsel in writing is legally required to be disclosed, provided that such disclosing Party shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**5.15    Website/Lead Source Redirection**. Seller shall cooperate and work with Buyer's information technology personnel to ensure that, following the Closing, all traffic on Seller's Dealerships websites and from other lead source channels are redirected to the applicable Buyer websites and lead source systems.

**5.16    Bulk Transfer Laws**. Seller will fully comply with all applicable requirements of the Uniform Commercial Code and other laws of the State of California relating to bulk transfers.

**5.17    Franchised Motor Vehicle Dealer License**. Buyer agrees to use its commercially reasonable best efforts to obtain a California franchised motor vehicle dealer license and a California Bureau of Automotive Repair license (collectively, the "Dealer License") with respect to the operation of the Dealerships. Should the State of California fail to issue Buyer the Dealer License on or before the Closing Date, Seller shall permit Buyer to use Seller's Dealer License, dealer number, and dealer tags for up to ninety (90) days ("License Usage Period") after the Closing Date, so as to enable Buyer to enjoy the benefits of its purchase of Seller's operating assets and goodwill, and so as to provide products and continuing service to customers. Should Buyer use Seller's Dealer License, Buyer agrees to indemnify and hold Seller (and its officers, directors and members) harmless from and against any and all claims, demands, losses, damages, penalties, fines, costs or expenses (including, but not limited to, all reasonable attorney's fees, whether such fees are incurred in any pretrial, trial, appellate or bankruptcy proceedings) whatsoever, as the same in any way relate to or arise out of the Buyer's use of Seller's Dealer License, dealer number or dealer license plates. During the License Usage Period, Buyer shall use continued commercially reasonable best efforts to obtain its Dealer License. Promptly after Buyer receives its Dealer License or the

20

expiration of the License Usage Period, whichever occurs first, Buyer shall return Seller's Dealer License, license number and dealer license plates, and Buyer shall cease using same.  During the time in which Buyer uses Seller's license, Buyer shall cause its insurer to list Seller as an additional insured under its policy and Buyer shall provide to Seller proof of same.  At the election of either Party, the other Party shall work in good faith to negotiate reasonably requested documentation to be executed at the Closing to reflect the provisions of this Section 5.17.

**5.18** **Leases**.  During the Diligence Period, provided that Buyer has not previously terminated this Agreement, Buyer and Seller will work together to finalize how Buyer will obtain rights to use and occupy the Property.  Buyer and Seller will work together to determine how to approach the landlord(s) to either negotiate new leases between the Buyer and the landlord(s) or to enter into acceptable assignments with the landlord(s), in each case on terms acceptable to Buyer in its sole discretion.  Seller represents and warrants that the copies of the Leases it will provide to Buyer in accordance with the terms hereof are true, correct and complete copies of the Leases.

**5.19** **Erroneous Payments**.  The Parties shall in good faith work together and use their commercially reasonable efforts to ensure that (i) amounts paid by Seller but owed by Buyer as a result of Manufacturers or vendors erroneously billing Seller for items arising out of or in connection with the operation of the Business following Closing shall be paid over to Seller promptly, and (ii) amounts paid by Buyer but owed by Seller as a result of Manufacturers or vendors erroneously billing Buyer for items arising out of or in connection with the operation of the Dealerships prior to Closing shall be paid over to Buyer promptly.

**5.20** **Dealer Trades**. From the Effective Date through the Closing Date, Seller agrees not to transfer any of its New Vehicle inventory to any new vehicle dealer outside of Seller's historical business practices.

**5.21** **No Interference**.  Seller shall not to take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer, supplier, Employee, or other business associate of the Business, or Seller, from maintaining the same business relationships with the Business and Buyer after the Closing Date as they maintained with the Business and Seller prior to the Closing.  Seller will refer all customer inquiries relating to the Business to Buyer from and after the Closing Date.

**5.22** **Unemployment Rate Factor; Worker's Compensation Experience Factor**.

(a)    Buyer, at its election, may utilize Seller's State of California unemployment rate factor to the full extent allowed under law.  Seller agrees to assist and cooperate with Buyer in such efforts.

(b)    Buyer, at its election, may utilize Seller's worker's compensation experience factor to the full extent allowed under California law.  Seller agrees to assist and cooperate with Buyer in such efforts.

**5.23** **Further Assurances**.  Each Party will execute and deliver any further instruments or documents, and take all further action, reasonably requested by the other Party to carry out the transactions contemplated by this Agreement and the Related Agreements.

**5.24** **Survival.**  Except as otherwise stated, the covenants of the Parties contained in this Article 5 will survive the Closing.

**6.    CONDITIONS PRECEDENT.**

**6.1    Conditions to Buyer's Obligations.** Buyer's obligations under this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Buyer:

(a)    Seller will have fully complied with and performed all its obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements. Seller will also have caused the Seller Principal to have fully complied with and performed all of his obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements.

(b)    Seller will have paid any and all current and delinquent contributions it or a member of Seller's controlled group is obligated to pay to the I.A.M. National Pension Fund and any other union pension plan.

(c)    Seller will have paid any and all withdrawal liability it or a member of Seller's controlled group is obligated to pay as a result of withdrawal from the I.A.M. National Pension Fund or another multi-employer union pension fund where the withdrawal arose out of or relates to this transaction.

(d)    All representations of Seller in this Agreement and the Related Agreements will be true and complete as of the date when given and on the Closing Date.

(e)    Buyer will have received all necessary approvals from the Manufacturers including, but not limited to, the appointment of Buyer's representative as the dealer principal, and the execution and delivery by Buyer and the applicable Manufacturer of the appropriate dealer agreements and related documentation; and Buyer shall be satisfied in its sole discretion with any facility or relocation demands or obligations that any Manufacturer conditions approval of Buyer upon. Notwithstanding the foregoing, if one or more of the Manufacturers exercises its right of first refusal or option to purchase the applicable Dealership and the associated Purchased Assets, then, either: (1) with the consent of both Buyer and Seller, Buyer will purchase the remaining Dealerships and Purchased Assets at new negotiated purchase prices if mutually agreed to by Buyer and Seller; or (2) this Agreement will be terminated.

(f)    Buyer will have secured the necessary financing required to complete the transactions contemplated hereby and by the Related Agreements, with the terms and structure to be deemed acceptable by Buyer in its sole discretion.

(g)    Buyer will have received all necessary approvals from the State of California and any regulatory body thereof to operate the Dealerships.

(h)    Buyer will have completed its due diligence investigations of the Dealerships, the Property and the Purchased Assets as of the Closing Date in accordance with Section 5.1 above and the relevant provisions of the Related Agreements, and will be satisfied with such investigations in its sole discretion and shall not have terminated this Agreement due to such due diligence investigations.

(i)    Buyer shall be satisfied in its sole discretion that the operation of the Business and the Property complies with all applicable laws, including, without limitation, municipal by-laws and zoning by-laws, and that the Buyer may continue to operate the Business in compliance with such laws post-Closing.

(j)      Buyer and the Seller Principal shall have executed and delivered a Non-Compete Agreement for Seller Principal.

(k)      Buyer and the applicable landlord(s) of the Property shall have executed and delivered the Lease Assignments.

(l)      All of the Purchased Assets shall be transferred to Buyer, or a permitted Buyer assignee, simultaneously on the Closing Date.

(m)      No material adverse change (as defined in Section 7.2 hereof) shall have occurred.

(n)      All consents, approvals and waivers required to consummate the transactions contemplated by this Agreement and the Related Agreements and allow Buyer to operate the Business will have been obtained in writing by Buyer and Seller, as applicable, including, without limitation, any workers' compensation legislation.

**6.2     Condition to Seller's Obligations.**  Seller's obligations under this Agreement are subject to the satisfaction, on or prior to the Closing Date, of the following conditions, which may be waived by Seller:

(a)      Buyer will have fully complied with and performed all its obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements.

(b)      All representations of Buyer in this Agreement and the Related Agreements will be true and complete as of the date when given and on the Closing Date.

(c)      The New Buyer Entities shall issue the Membership Interests to the Seller Principal.

(d)      All of the Purchased Assets shall be transferred to Buyer, or a permitted Buyer assignee, simultaneously on the Closing Date.

(e)      All consents, approvals and waivers (including the approval by the Manufacturers) required to consummate the transactions contemplated by this Agreement and the Related Agreements will have been obtained in writing by Buyer and Seller, as applicable.

**6.3     Timing**.  The Parties shall undertake to finalize all Closing documents and to satisfy all conditions precedent set forth in this Section 6 at least seven (7) days prior to the Closing to allow for an orderly Closing.

## 7.     TERMINATION OF AGREEMENT; EFFECT OF TERMINATION.

**7.1     Termination.**  This Agreement may be terminated at any time before the Closing as follows:

(a)      By Buyer, by notice to Seller, if any of Buyer's conditions precedent to Closing have not been satisfied as of the Closing Date or has become incapable of being satisfied by the Closing Date through no breach hereof by Buyer.

(b)      By Seller, by notice to Buyer, if any of Seller's conditions precedent to Closing have not been satisfied as of the Closing Date or has become incapable of being satisfied by the Closing Date through no breach hereof by Seller.

(c)      Subject to Section 3.1 above, by Buyer or Seller, by notice to the other, if the Closing does not take place on or before the Closing Date Deadline (as automatically extended in accordance with Section 3.1(a)); provided that a Party will not be entitled to terminate this Agreement pursuant to this Section 7.1 if such Party's willful breach of this Agreement or any Related Agreement or intentional misrepresentation under this Agreement or any Related Agreement has prevented the Closing from taking place before such date.

**7.2      Effect of Termination.**  Upon a termination in accordance with Section 7.1, this Agreement will have no further force or effect.  The Parties' rights under this Article 7 are cumulative and are in addition to the other rights and remedies available to them under the Related Agreements or any other agreement.  If Seller fails to consummate the transactions described herein as a result of a breach by Buyer of its obligations hereunder or under the Related Agreements, Seller shall have the right to terminate this Agreement upon written notice to Buyer and retain the Earnest Money Deposit.  If Buyer fails to consummate the transactions described herein as a result of (i) a breach by Seller of its obligations hereunder or under the Related Agreements, (ii) the results of Buyer's diligence review of the Dealerships and the Property being unsatisfactory to Buyer for any reason whatsoever, (iii) as a result of the non-fulfillment of one or more conditions set forth in Section 6.1(c) or Section 6.1(e), or (iv) the occurrence of a "material adverse change" after the Effective Date and prior to the Closing Date with respect to Seller, the Dealerships, the Purchased Assets, or the Property ((i)-(iv), collectively, the Refund Conditions"), Buyer shall have the right to terminate this Agreement upon written notice to Seller (which, in the case of (ii), such written notice shall have been provided on or prior to the expiration of the Diligence Period) and have the Earnest Money Deposit refunded to Buyer, or pursue any applicable remedies available under law or equity, including specific performance and reimbursement of attorneys' fees and all costs of collection incurred by Buyer.  If Buyer fails to consummate the transactions described herein for any reason other than the Refund Conditions, Seller shall retain the Earnest Money Deposit.  For purposes of this Section 7.2, a "material adverse change" shall mean an event, circumstance, development or condition that, either individually or in the aggregate, has had or could be reasonably expected to have a material adverse effect on the ability of Buyer to operate the Dealerships, the Purchased Assets, or the Property after the Closing Date as Seller operates the Dealerships, the Purchase Assets, and the Property prior to the Closing Date.

**8.      RISK OF LOSS.**

If, prior to the Closing Date, the Purchased Assets or any portion thereof, are destroyed by fire or other casualty, then Buyer will have the option, to be exercised within ten (10) days following the notification of such destruction, but in any event prior to the Closing Date, to either (a) deduct from the Purchase Price the value of those Purchased Assets which were so destroyed as is mutually agreed to by Buyer and Seller or, in the event of disagreement, in the amount determined by an arbitrator or appraiser mutually agreed to by Buyer and Seller, and to otherwise consummate this transaction at such reduced Purchase Price, (b) consummate this transaction without any deduction, in which event Buyer will be entitled to receive all casualty insurance proceeds payable to Seller due to such destruction, if any, and Seller will assign such proceeds (or the right to receive such proceeds) to Buyer, or (c) terminate this Agreement and have the Earnest Money Deposit returned to Buyer.  If, prior to the Closing Date, the Property or any portion thereof, are destroyed by fire or other casualty, or a condemnation occurs or is threatened in writing to occur, then Buyer will have the option, to be exercised within ten (10) days following the notification of such destruction or condemnation, but in any event prior to the Closing Date, to terminate this Agreement and have the Earnest Money Deposit returned to Buyer.

24

9.      MISCELLANEOUS.

9.1      **No Waiver.**  No waiver of any breach of any provision of this Agreement will be deemed a waiver of any other breach of this Agreement.  No extension of time for performance of any act will be deemed an extension of the time for performance of any other act.

9.2      **Severability.**  The provisions of this Agreement will be deemed severable, and if any provision of this Agreement is held illegal, void or invalid under applicable law, such provision may be changed to the extent reasonably necessary to make the provision legal, valid and binding.

9.3      **Entire Agreement; Amendment.**  This Agreement, the Related Agreements and the schedules, exhibits and attachments to such agreements contain the entire agreement of the Parties with respect to the purchase and sale of the Purchased Assets and the other transactions contemplated by such agreements.  This Agreement may be amended only by an instrument in writing signed by Buyer and Seller. The headings in this Agreement are solely for convenience of reference and will not affect the interpretation of any provision of this Agreement.  The Schedules to this Agreement are incorporated as a part of this Agreement.

9.4      **Applicable Law.**  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

9.5      **Time is of the Essence.**  The Parties to this Agreement acknowledge and agree that time is of the essence with respect to the consummation of the transactions contemplated by this Agreement and each Related Agreement.

9.6      **Binding Agreement, Assignment.**  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller, as applicable; provided, however, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates or to an entity or entities to be formed by Buyer or an Affiliate of Buyer (the "New Buyer Entities") and (ii) designate one or more of its Affiliates or one or more New Buyer Entities to perform its obligations hereunder.

9.7      **Expenses.**  Each Party will pay all of its expenses, including attorneys' and accountants' fees in connection with the negotiation of this Agreement or any Related Agreement, the performance of its obligations hereunder or thereunder, and the consummation of the transactions contemplated by this Agreement or any Related Agreement; provided that in any proceeding or other attempt to enforce, construe or to determine the validity of this Agreement or any Related Agreement, the nonprevailing Party will pay the reasonable expenses of the prevailing Party, including reasonable attorneys' fees and costs.

9.8      **Notices.**  All notices, demands or other communications required or permitted to be given hereunder will be in writing, and any and all such items will be deemed to have been duly delivered upon personal delivery; or as of the third business day after mailing by United States mail, certified, return receipt requested, postage prepaid, addressed as follows; or as of the immediately following business day after deposit with Federal Express or a similar overnight courier service, addressed as follows; or as of the business day if by facsimile to the facsimile number set forth below:

        Notices to Seller:

        Weber Motors, Fresno Inc.

25

7121 North Palm Avenue
Fresno, California 93650
Attn: Christopher J. Wilson
Phone: (602) 918-3626
Email: cj.wilson@bmwfresno.com

With copies to:

BT Advisors
3021 Mcgraw St.
San Diego, California 92117
Attn: Reggie Borkum
Phone: (858) 201-6753
Email: rborkum@btadvisor.com

Notices to Buyer:

Foundation Auto Holdings, LLC
211 Highland Cross Drive, Suite 260
Houston, Texas 77073
Attn: Derek Slemko
Phone: (832) 280-5340
Email: dereks@foundationauto.com

With copies to:

Holland & Knight LLP
1801 California Street, Suite 5000
Denver, Colorado 80202
Attention:  Stephen Dietrich
Phone:  (303) 974-6550
Email: stephen.dietrich@hklaw.com

Any Party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth above using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the intended recipient.  Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

**9.9     Counterparts.**  This Agreement may be executed in one or more counterparts, any one of which need not contain the signatures of more than one Party, but all such counterparts taken together will constitute one and the same instrument.  This Agreement may also be executed by facsimile or "PDF" counterparts.  In the event facsimile or "PDF" counterparts are used to execute this Agreement, Buyer and Seller shall timely deliver to the other original counterparts for their respective records.

**9.10    Press Releases.**  No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement prior to the Closing without the prior written approval of Buyer and Seller; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly-traded

26

securities, if any (in which case the disclosing Party will use its reasonable best efforts to advise the other Party prior to making the disclosure). In the event Section 5.15 above conflicts with the provisions of this Section 9.10, this Section 9.10 shall prevail.

**9.11   Tax Cooperation.**  Buyer and Seller will provide the other with such information and records and make such of its officers, directors, employees and agents available as may reasonably be requested by Buyer or Seller in connection with the preparation of any tax return, audit, tax contest or other proceeding that relates to the Dealerships or Seller.  Buyer and Seller agree that each will report the federal, state and local income and other tax consequences of the purchase and sale contemplated by this Agreement in a manner consistent with the calculation of the Purchase Price pursuant to Schedule 2.3, including the preparation and filing of Forms 8594 as required by Section 1060 of the Code with their respective federal income tax returns for the taxable year which includes the Closing Date.  Neither Party will take any position inconsistent with such allocation unless otherwise required by applicable law.  Each Party will provide the other Party with a copy of any information to be furnished to the Secretary of the Treasury as required by Section 1060 of the Code.

**9.12   Arm's Length Negotiations; Construction.**  Each Party herein expressly represents and warrants to all other Parties hereto that (a) before executing this Agreement, such Party has fully informed itself of the terms, contents, conditions and effects of this Agreement; (b) such Party has relied solely and completely upon its own judgment in executing this Agreement; (c) such Party has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement; (d) such Party has acted voluntarily and of its own free will in executing this Agreement; (e) such Party is not acting under duress, whether economic or physical, in executing this Agreement; and (f) this Agreement is the result of arm's length negotiations conducted by and among the Parties and their respective counsel.  Further, it is the mutual intent of the Parties that the transactions contemplated in this Agreement pertain to the sale by Seller and purchase by Buyer of all of the Purchased Assets, which includes but is not limited to, all of the Dealerships and any assets required to operate the Dealerships.  The conveyance of all of the Purchased Assets is a material inducement for the Parties to enter this agreement.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**9.13   Submission to Jurisdiction**.  Each of the Parties submits to the jurisdiction of any federal or state court in the State of California, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court.  Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.  Any Party may make service on any other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.8.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]*

27

The Parties have executed and delivered this Agreement on the date set forth in the introductory paragraph of this Agreement.

**BUYER:**

FOUNDATION AUTO HOLDINGS, LLC,
a Delaware limited liability company

By: _____

Name: _Kevin Kutschinski_____

Title: _President/ CEO_____


**SELLER:**

WEBER MOTORS, FRESNO, INC.,
a California corporation

By: _____

Name: _CHRISTOPHER J WILSON_____

Title: _PRESIDENT_____


CJ'S ROAD TO LEMANS CORP.,
a California corporation

By: _____

Name: _CHRISTOPHER J. WILSON_____

Title: _PRESIDENT_____


The undersigned hereby acknowledges, agrees, and executes as to Section 2.4(c), Section 3.2, Section 5.3(d), Section 5.13 and Section 5.14 above as of the Effective Date.

_____

Christopher J. Wilson,  Individually

28

## LIST OF EXHIBITS AND SCHEDULES

### EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale and Assignment |
| Exhibit B | Form of Non-Compete Agreement |
| Exhibit C | Form of Employment Agreement |

### SCHEDULES

| | | |
|---|---|---|
| Schedule 1.1 | — | Purchased Assets |
| Schedule 1.1(H) | — | Fixed Assets |
| Schedule 1.2 | — | Excluded Assets |
| Schedule 1.3 | — | Assumed Contracts |
| Schedule 2.3 | — | Allocation of Purchase Price |
| Schedule 4.1(d) | — | Litigation |
| Schedule 4.1(e) | — | Material Agreements |
| Schedule 4.1(f) | — | Employees |
| Schedule 4.1(g) | — | Types of Tax Returns |
| Schedule 4.1(h) | — | Existing Subleases, Licenses and other Rights of Occupancy |
| Schedule 4.1(i) | — | Environmental Conditions |
| Schedule 4.1(j) | — | Employee Benefit Plans |
| Schedule 4.1(k) | — | Debt |
| Schedule 4.1(l) | — | Financial Statement List |
| Schedule 4.1(m) | — | Insurance Policies |
| Schedule 4.1(n) | — | Proprietary Rights |
| Schedule 4.1(o) | — | Approvals |
| Schedule 4.1(p) | — | Product Liability |
| Schedule 4.1(q) | — | Manufacturer Matters |
| Schedule 4.1(s) | — | Prior Operational Names |
| Schedule 4.1(t) | — | Business Marketing Plans |
| Schedule 4.1(u) | — | No Damaged Vehicles |
| Schedule 4.1(y) | — | Operation of Business |
| Schedule 4.1(z) | — | Liabilities |

## EXHIBIT A

### FORM OF BILL OF SALE AND ASSIGNMENT

### BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of the _____ day of _____, 20___, by WEBER MOTORS, FRESNO, INC., a California corporation d/b/a BMW Fresno ("Weber Motors"), and CJ'S ROAD TO LEMANS CORP., a California corporation d/b/a Audi Fresno and Porsche Fresno ("Road to Lemans", and collectively with "Weber Motors", "Seller"), to and for the benefit of [_____], LLC, a Delaware limited liability company ("Buyer").

### RECITALS

A.      Seller owns and operates the following dealerships (the "Dealerships"): (i) a BMW dealership located at 7171 North Palm Avenue, Fresno, California 93650 (the "BMW Dealership"); (ii) an Audi dealership located at 7121 North Palm Avenue, Fresno, California 93650 (the "Audi Dealership"); and (iii) a Porsche dealership located at 7121 North Palm Avenue, Fresno, California 93650 (the "Audi Dealership").

B.      Seller and Foundation Auto Holdings, LLC, a Delaware limited liability company ("Foundation Auto"), as "Buyer," are parties to that certain Asset Purchase Agreement dated as of [_____], 2020, as amended (the "Purchase Agreement"), regarding the acquisition of assets related to Seller's motor vehicle dealerships, including the Dealerships.  Capitalized terms not otherwise defined in this Agreement have the meanings given them in the Purchase Agreement.

C.      Foundation Auto has assigned all of its rights and obligations under the Purchase Agreement relating to the [REFERENCE SPECIFIC FRANCHISE] Dealership to Buyer under the terms of that certain Assignment and Assumption Agreement dated _____, 20__, between Foundation Auto and Buyer, including the right to receive, own and hold title to the Purchased Assets (as defined below).

D.      Under the Purchase Agreement, Seller is to sell and Buyer is to purchase certain of Seller's assets used or useable by Seller in connection with or related to the [REFERENCE SPECIFIC FRANCHISE] Dealership, as more particularly described on Schedule 1 attached hereto (the "Purchased Assets").  In connection with the conveyance of the Purchased Assets, Seller also desires to assign, and Buyer desires to assume, all of Seller's right, title and interest in and to those contracts listed on Schedule 2 attached hereto and made a part hereof (the "Assumed Contracts").

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Assignment.  Subject to the terms and conditions of the Purchase Agreement, Seller does hereby sell, convey, assign, transfer and deliver to Buyer, its successors and assigns, free and clear of all security interests, liens, restrictions, claims, encumbrances or charges of any kind (other than

any liabilities specifically assumed in writing by Buyer), all of Seller's right, title and interest in and to the Purchased Assets.

TO HAVE AND TO HOLD all such Purchased Assets hereby sold, conveyed, assigned, transferred and delivered unto Buyer, its successors and assigns, for its and their own use, benefit and behalf forever.

This Agreement is executed and delivered in connection with the Purchase Agreement and notwithstanding anything set forth herein, nothing herein shall in any way vary the covenants, representations and warranties of Seller and Buyer as set forth in the Purchase Agreement.

2.    Assumption.  Buyer hereby expressly assumes and agrees to perform all of the obligations of Seller under the contracts set forth at Schedule 2 (the "Assumed Contracts") to be performed from and after the date hereof.  Except as expressly assumed pursuant to this Section 2, Buyer assumes no obligations, liabilities or debts of Seller, contingent or otherwise, presently existing or arising after the date hereof.

3.    Obligations.  Other than as specifically stated above or in the Purchase Agreement as assigned, Buyer assumes no debt, liability or obligation of Seller, and it is expressly understood and agreed that all debts, liabilities and obligations not assumed hereby by Buyer shall remain the sole obligation of Seller, its successors and assigns

4.    Further Assurances.  Seller covenants and agrees that it will at any time and from time to time do, execute, acknowledge, and deliver any and all other acts, deeds, assignments, transfers, conveyances, powers of attorney, or other instruments that Buyer deems reasonably necessary or proper to carry out the assignments, conveyances and assumptions intended to be made hereunder.

5.    Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

6.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

*[Signature Page Follows]*

A-2

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

**SELLER:**

WEBER MOTORS, FRESNO, INC.,
a California corporation

By: _____
Name: _____
Title: _____

CJ'S ROAD TO LEMANS CORP.,
a California corporation

By: _____
Name: _____
Title: _____

**BUYER:**

_____, LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

A-3

## SCHEDULE 1 TO BILL OF SALE

**PURCHASED ASSETS**

## SCHEDULE 2 TO BILL OF SALE

**ASSUMED CONTRACTS**

**EXHIBIT B**

**FORM OF NON-COMPETE AGREEMENT**

(SEE ATTACHED)

NONCOMPETITION AND NONSOLICITATION AGREEMENT

THIS NONCOMPETITION AND NONSOLICITATION AGREEMENT (this "Agreement") is entered into as of the ___ day of _____, 2020 (the "Effective Date"), by and among FA CA FRESNO-B, LLC, a Delaware limited liability company ("BMWCo"), FA CA FRESNO-A, LLC, a Delaware limited liability company ("AudiCo"), FA CA FRESNO-P, LLC, a Delaware limited liability company ("PorscheCo", and together with BMWCo and AudiCo, each a "Buyer" and collectively, the "Buyers"), and CHRISTOPHER J. WILSON, an individual resident of the State of California (the "Individual").

W I T N E S S E T H:

WHEREAS, the Individual is associated with CJ'S ROAD TO LEMANS CORP., a California corporation, doing business as Audi Fresno and Porsche of Fresno, and WEBER MOTORS, FRESNO, INC., doing business as BMW Fresno (collectively, "Seller"), which Seller owns certain assets used or useful in the operation of BMW, Audi, and Porsche motor vehicle sales and service businesses (collectively, the "Dealerships") principally located at: (i) 7171 N Palm Ave, Fresno, CA 93650; and (ii) 7121 N Palm Ave, Fresno, CA 93650 (collectively, the "Dealership Properties");

WHEREAS, the Individual has been involved in the business of Seller;

WHEREAS, the Buyers have agreed to purchase the Purchased Assets (as defined in the Purchase Agreement) pursuant to that certain Asset Purchase Agreement dated _____, 2020, by and among the Seller and Foundation Auto Holdings, LLC, a Delaware limited liability company ("Foundation"), as assigned by Foundation to each Buyer by those certain Assignment and Assumption Agreements each dated on or about the date hereof, and as may be further assigned in part (as amended, the "Purchase Agreement");

WHEREAS, the involvement by the Individual in a business in competition with the Dealerships or the Buyers would diminish the value of the Purchased Assets; and

WHEREAS, as an inducement to the Buyers to consummate their respective purchases of the Purchased Assets, the Individual has agreed not to compete with the Dealerships or the Buyers and to refrain from making disclosures to the extent set forth below.

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

Section 1.    Definitions.  All terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

Section 2.    Restrictive Covenants.  As a material inducement for Buyers to consummate the transactions under the Purchase Agreement, the Individual agrees that the Individual shall not, directly or indirectly:

#79526555_v1

(a)    For a period beginning on the Effective Date and continuing through the date which is two (2) years following the Separation Date (such period, the "Restricted Period"), own (including, without limitation, as a partner, joint venturer, director, officer, consultant, agent, member or stockholder) a business located within a 75-mile radius of the Dealership Properties that operates as (i) a Porsche, Audi, or BMW automotive sales and service business, or (ii) any other branded or franchised automotive sales and service business which is the same line-make as any Additional Dealership.  For illustration purposes only, if an affiliate of Buyer acquired a Toyota automotive sales and service business within 75 miles of any Dealership Property after the Effective Date but prior to the Separation Date, the foregoing restriction in subclause (ii) shall prevent Individual from owing a business that operates as a Toyota automotive sales and service business within 75 miles of any Dealership Property during the Restricted Period.  The restrictions in this Section 2(a) shall not apply to Individual's ownership in Buyers, or an affiliate of Buyers, if any.  For purposes of clarity, the restrictions under this Section 2(a) shall specifically not permit Individual to engage in new or used motor vehicle sales or service operations.  For purposes of this Agreement, the latest date upon which Individual ceases to be employed by any Buyer or any affiliate of any Buyer shall be referred to as the "Separation Date".  For purposes of this Agreement, any branded or franchised automotive sales and service business any Buyer or any affiliate of any Buyer acquires following the Effective Date, but prior to the Separation Date within 75 miles of the Dealership Properties shall be referred to as an "Additional Dealership", and collectively, the "Additional Dealerships".

(b)    For a period beginning on the Effective Date and continuing through the Restricted Period, (i) solicit from the Dealerships or any Additional Dealerships any business with any customer or account of the Dealerships or any Additional Dealerships with which the Individual had any contact or association; (ii) solicit, induce or attempt to solicit any customers from the current Sellers or from any Buyer or its affiliates who will own and manage the Dealerships or any Additional Dealerships following Closing; provided, however, that any general advertising of business operations shall not be a violation of this subclause (ii); (iii) solicit or otherwise induce to leave the employ of any Buyer or its affiliates any employees or associates from the current Sellers or from any Buyer or its affiliates who will own and operate the Dealerships or any Additional Dealerships following Closing; or (iv) hire any employees or associates from the current Sellers or from any Buyer or its affiliates who will own and operate the Dealerships or any Additional Dealerships following Closing unless approved by the Buyers.  The provisions of this Section 2(b) shall not apply in the event a restricted employee independently approaches Individual for work outside of a radius of 75 miles from the Dealership Properties.

For purposes of Section 2(a) above, the phrase "own a business"  shall be deemed to include engaging in any of the following activities if it occurs within the applicable restricted geographic area set forth in such Section or if it is in connection with any business, as defined in 2(a), located within the applicable restricted geographic area set forth in Section 2(a): (i) accepting designation by any automotive manufacturer as an authorized automobile dealer (whether in connection with the establishment of additional dealer representation by such manufacturer or otherwise) that is a violation of 2(a), (ii) submitting an application to an automotive manufacturer for consideration of designation as an

2

authorized automobile dealer by such manufacturer that is in violation of 2(a) above, (iii) executing an agreement to purchase or acquire any automotive franchise or operating assets of an automotive franchise that is a violation of 2(a) above, or (iv) engaging in any action in preparation for or connection with, or related or incidental to, the prohibited actions described in clauses (i), (ii) or (iii) above.

Further, for purposes of Section 2(a) above, the defined term "Dealership Properties" shall be deemed to include any replacement location where the Dealerships are operated during the applicable time period under Section 2(a).

Section 3.    Specific Performance.   The parties hereto agree that their rights hereunder are special and unique and that any violation thereof would not be adequately compensated by money damages, and each grants the other the right to specifically enforce (including injunctive relief where appropriate) the terms of this Agreement in any state court sitting in Fresno County, State of California, or any Federal Court sitting in the State of California, without the obligation of posting any bond.  The parties consent to such jurisdiction, agree that venue will be proper in such courts and waive any objections based upon forum non conveniens. The choice of forum set forth in this Section 3 shall not be deemed to preclude the enforcement of any action under this Agreement in any other jurisdiction.

Section 4.    Notices.    Any notice, request, consent or communication (collectively a "Notice") under this Agreement shall be effective only if it is in writing and (i) personally delivered, (ii) sent by certified or registered mail, return receipt requested, postage prepaid, (iii) sent by a nationally recognized overnight delivery service, with delivery confirmed, or (iv) emailed, with receipt confirmed, addressed as follows:

Notices to the Individual:

C.J. Wilson

_____
_____
Attn: _____
Phone:  _____
Email: _____

With copies to:

[Insert]

Notices to Buyers:

c/o Foundation Automotive Corp.
#520, 2424- 4th Street SW
Calgary, AB T2S 2T4
Attn: Derek Slemko
Phone: (403) 452-5734
Email: dereks@foundationauto.com

3

With copies to:

Holland & Knight LLP
1801 California Street, Suite 5000
Denver, Colorado 80202
Attention:  Stephen Dietrich
Phone:  (303) 974-6550
Email: stephen.dietrich@hklaw.com

or such other persons or addresses as shall be furnished in writing by any party to the other party. A Notice shall be deemed to have been given as of the date when (i) personally delivered, (ii) five (5) days after the date when deposited with the United States mail properly addressed, (iii) when receipt of a Notice sent by an overnight delivery service is confirmed by such overnight delivery service, or (iv) when receipt of the facsimile is confirmed, as the case may be, unless the sending party has actual knowledge that a Notice was not received by the intended recipient.

Section 5.    <u>Assignment</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by the Individual.  The Individual hereby acknowledges, consents to and ratifies any future assignment of this Agreement by any Buyer to its successors and assigns, including, without limitation, any lender of any Buyer or any affiliate of any Buyer.

Section 6.    **<u>LITIGATION</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF CALIFORNIA, AND NO DOCTRINE OF CHOICE OF LAW SHALL BE USED TO APPLY ANY LAW OTHER THAN THAT OF CALIFORNIA, AND NO DEFENSE, COUNTERCLAIM OR RIGHT OF SET-OFF GIVEN OR ALLOWED BY THE LAWS OF ANY OTHER STATE OR JURISDICTION, OR ARISING OUT OF THE ENACTMENT, MODIFICATION OR REPEAL OF ANY LAW, REGULATION, ORDINANCE OR DECREE OF ANY FOREIGN JURISDICTION, BE INTERPOSED IN ANY ACTION HEREON.  THE PARTIES AGREE THAT ANY ACTION OR PROCEEDING TO ENFORCE OR ARISING OUT OF THIS AGREEMENT MAY BE COMMENCED IN ANY STATE COURT SITTING IN FRESNO COUNTY, CALIFORNIA, OR IN ANY FEDERAL COURT SITTING IN NORTH DAKOTA.  THE PARTIES CONSENT TO SUCH JURISDICTION, AGREE THAT VENUE WILL BE PROPER IN SUCH COURTS AND WAIVE ANY OBJECTIONS BASED UPON <u>FORUM NON CONVENIENS</u>.  THE CHOICE OF FORUM SET FORTH IN THIS <u>SECTION 6</u> SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT OF ANY ACTION UNDER THIS AGREEMENT IN ANY OTHER JURISDICTION.**

Section 7.    <u>Severability</u>.  Each Buyer and the Individual believe the covenants against competition contained in this Agreement are reasonable and fair in all respects, and are necessary to protect the interests of the Buyers.  However, in case any one or more of the provisions or parts of a provision contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect in any jurisdiction, such invalidity, illegality or

4

unenforceability shall not affect any other provision or part of a provision of this Agreement or any other jurisdiction, but this Agreement shall be reformed and construed in any such jurisdiction as if such invalid or illegal or unenforceable provision or part of a provision had never been contained herein and such provision or part shall be reformed so that it would be valid, legal and enforceable to the maximum extent permitted in such jurisdiction.

Section 8.    Neutral Interpretation.  This Agreement constitutes the product of the negotiation of the parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any party based upon the source of the draftsmanship hereof.

Section 9.    Waiver of Compliance; Consents.  Any failure of the Individual to comply with any obligation, covenant, agreement or condition herein may be waived only in writing by the Buyers, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  No failure or delay by any Buyer in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  Whenever this Agreement requires or permits consent by or on behalf of the Buyers, any such written consent given by the Buyers shall be deemed given in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 9.  No notice to or demand on the Individual in any case shall entitle the Individual to any other or further notice or demand in related or similar circumstances requiring such notice.

Section 10.    Miscellaneous.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. This Agreement embodies the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein and may not be modified orally, but only by a writing subscribed by the party charged therewith.  There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

**[SIGNATURES ON FOLLOWING PAGE]**

#79526555_v1

IN WITNESS WHEREOF, the parties hereto have made and entered into this Agreement the date first hereinabove set forth.

**BUYERS**:

**FA CA FRESNO-B, LLC,**
a Delaware limited liability company


By: _____
Name:
Title:


**FA CA FRESNO-A, LLC,**
a Delaware limited liability company


By: _____
Name:
Title:


**FA CA FRESNO-P, LLC,**
a Delaware limited liability company


By: _____
Name:
Title:


**THE INDIVIDUAL**:



_____
Christopher J. Wilson, Individually

6

#79526555_v1

**EXHIBIT C**

**FORM OF EMPLOYMENT AGREEMENT**

(SEE ATTACHED)

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into on _____, 2020 (the "Effective Date"), by and between, on the one hand, [FA CA Fresno-B, LLC, a Delaware limited liability company] (the "BMW Company"), and, on the other hand, Christopher J. Wilson ("Employee"), an individual.  The Company and Employee may be referred to herein jointly as "the parties" or individually as "the party."

**WHEREAS**, the BMW Company desires to employ the Employee as (i) [General Manager] of the [BMW Fresno] dealership owned and operated by the BMW Company, (ii) [General Manager] of the [Audi Fresno] dealership owned and operated by the BMW Company's affiliate, FA CA Fresno-A, LLC, a Delaware limited liability company (the "Audi Company"), and (iii) [General Manager] of the [Porsche of Fresno] dealership owned and operated by the BMW Company's affiliate, FA CA Fresno-P, LLC, a Delaware limited liability company (the "Porsche Company", and collectively with the BMW Company and the Audi Company, the "Companies", and each, a "Company"), in each case on an at-will basis.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained herein, and for good and valuable consideration receipt of which is hereby acknowledged, the BMW Company and Employee agree as follows:

1.      **Job Duties and Responsibilities**

Beginning on the Effective Date, the BMW Company agrees to employ Employee for the positions set forth in the recitals.  The recitals are incorporated herein by reference as if fully set forth herein. The BMW Company classifies these positions as overtime exempt positions. Employee shall perform functions, duties, and responsibilities as are reasonably required in the performance of Employee's positions, or as may be assigned from time to time by the Companies. Employee is encouraged, but not required to participate in outside events that promote the Companies (the "Outside Events").  At the Outside Events, Employee shall endeavor to wear Company dealership logos, subject to restrictions related to each such engagement.  Employee shall not be entitled to any additional compensation from any Company with respect to the Outside Events.  Employee shall not engage in any Outside Event which would result in a breach by Employee of that certain Non-Competition and Non-Solicitation Agreement dated of even date herewith by and among Employee and the Companies.

2.      **At-Will Employment**

Employee's employment with the BMW Company will be "at-will".  Employee and the BMW Company retain the right to terminate the employment relationship at will, at any time, with or without cause or prior notice.  Any change to the at-will employment relationship must be by a specific, written agreement signed by Employee and the LLC Manager of the BMW Company. By signing this Agreement, Employee acknowledges and represents that no official of any Company has made any verbal or written promise or representation that is contrary to the at-will nature of Employee's employment by the BMW Company. For the avoidance of doubt, if Employee is deemed to be an employee of any Company other than the BMW Company,

Employee's employment with such Company will be "at-will", such that Employee and the applicable Company retain the right to terminate the employment relationship at will, at any time, with or without cause or prior notice.  In the event the Employee's employment with the BMW Company or its affiliates terminates for any reason whatsoever, the put and call rights set forth in that certain Amended and Restated Limited Liability Company Agreement of the BMW Company, as the same may be amended, restated, modified and/or supplemented from time to time (including, without limitation, Sections 10.4 and Section 10.13 thereof) shall apply.

3.    **Work Location**

The principal place of Employee's employment shall be at (i) 7171 N Palm Ave, Fresno, CA 93650; and (ii) 7121 N Palm Ave, Fresno, CA 93650, provided that, Employee may be required to travel on business on behalf of one or more of the Companies.

4.    **Compensation**

4.1    Base Salary. As compensation for all services to be rendered by Employee, and the performance of Employee's job duties and responsibilities, the BMW Company agrees to pay Employee Sixteen Thousand Dollars ($16,000) per month base salary, less legally required withholdings and deductions, in accordance with the BMW Company's customary payroll practices and applicable wage payment laws ("Base Pay"). Base Pay shall be prorated for any partial months worked. The Employee's compensation in Section 4 may be adjusted from time to time at the Companies' sole discretion. However, Employee's Base Pay may not be decreased without constituting Good Reason (as defined below), unless the Company simultaneously decreases the compensation of similarly-situated employees.

4.2    Net Profits Bonus.  The BMW Company shall pay Employee a monthly bonus of 10% of the net monthly profit of BMW Fresno, Audi Fresno, and Porsche of Fresno ("Net Profit Bonus"). Employee's Net Profit Bonus will be calculated using generally accepted accounting principles and paid on the first payroll date following completion of the month end manufacturer financial statements. However, the decision to provide any Net Profit Bonus and the amount and terms of any Net Profit Bonus shall be in the sole and absolute discretion of the Companies.

4.3    Year-End Bonus.  The BMW Company shall pay Employee a yearly bonus of 5% of the net annual profit of BMW Fresno, Audi Fresno, and Porsche of Fresno ("Year-End Bonus"). Employee's Year-End Bonus will be calculated using generally accepted accounting principles and paid on the first payroll date following completion of all of the Companies' yearly manufacturer financial statements, but no later than May 31st of the year after year to which the Year-End Bonus relates. However, the decision to provide any Net Profit Bonus and the amount and terms of any Net Profit Bonus shall be in the sole and absolute discretion of the Companies.

4.4    F&I Bonus.  The BMW Company shall pay Employee a monthly bonus of: (a) $25.00 for every warranty sold; and (b) $10.00 for every ancillary product sold including: wheel and tire, theft protection, paintless dent repair, key replacement, Vantage Protection bundle(s), windshield replacement/repair, and Paint and Fab, but expressly excluding ELO GPS and pre-paid maintenance products ("F&I Bonus"). The F&I Bonus will be based warranties and ancillary

products sold from BMW Fresno, Audi Fresno, and Porsche of Fresno.  Employee's F&I Bonus will be paid on the first payroll date following completion of the previous month end in which the F&I Bonus was earned.

5.    **Benefits**

5.1    <u>Benefit Plans</u>.  Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the BMW Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The BMW Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

5.2    <u>Vacation</u>. Employee shall be entitled to two (2) weeks of paid vacation days per calendar year (prorated for partial years) in accordance with the BMW Company's vacation policies and applicable law, as in effect from time to time.

5.3    <u>Company Vehicle</u>.  Employee shall be entitled to one demonstrator vehicle for personal use and one demonstrator vehicle for family use.  Employee will be taxed in accordance with IRS Rules governing this fringe benefit.  Employee agrees to be bound to and abide by the BMW Company's policy (or, if BMW Company does not have such a policy, Foundation Auto Holdings, LLC's policy) regarding demonstrator vehicles.

6.    **Termination.**

6.1    <u>By the BMW Company without Cause or Due to Death or Disability</u>.  The BMW Company may terminate Employee's employment with the BMW Company at any time for any reason other than Cause (as defined below). Employee's employment under this Agreement and any obligations of Employee hereunder will terminate automatically upon the date of Employee's death. The BMW Company will have the right to terminate Employee's employment under this Agreement for permanent or long-term disability of Employee. For purposes of this Agreement, Employee is disabled under the preceding sentence if he is determined to be disabled under the BMW Company's long-term disability plan.

6.2    <u>By the BMW Company with Cause or Termination by Employee</u>.  The BMW Company may terminate Employee's employment with the BMW Company at any time for Cause. The Employee may terminate his employment with the BMW Company at any time with two weeks' notice to the BMW Company.  If the BMW Company terminates Employee's employment for Cause, or if Employee terminates his employment with the BMW Company without Good Reason (as defined below), Employee shall be entitled to receive his Final Compensation (defined in Section 6.3(a) of this Agreement) through the effective date of Employee's termination. Termination for "Cause" shall mean termination by the BMW Company of Employee for any one or more of the following reasons: (i) theft, dishonesty, or falsification of any employment record or any of the Companies' or any of its Affiliates' records; (ii) habitual neglect of Employee's duties or wanton negligence by Employee in the performance of Employee's duties; (iii) material breach by Employee of this Agreement or any written policy of any of the Companies; (iv) conviction of

Employee of any felony or crime involving moral turpitude (excluding minor offenses unrelated to work or qualifications of work, such as traffic or parking violations or like); (v) a judicial or arbitral decision that Employee acted in an intentionally tortious or otherwise unlawful manner toward any of the Companies or any of their Affiliates, another employee or client or customer of any of the Companies or any of their Affiliates; (vi) a breach of any of Employee's fiduciary duties to any of the Companies; or (vii) illegal drug or substance abuse by Employee or illegal drug or substance addiction on Employee's part; provided, however, to the extent an action by Employee (or an omission to act) which constituted "Cause" for purposes of termination of employment hereunder (A) was not grossly negligent, (B) did not constitute willful misconduct and (C) can be cured within a period of thirty (30) days, then the BMW Company shall provide Employee written notice thereof and Employee may cure such action or omission to the reasonable satisfaction of the BMW Company within thirty (30) days of receipt of such notice.

    6.3    Payments Upon Termination of Employment.

    (a)    Accrued Compensation. Upon termination of Employee's employment for any reason hereunder, the Company will be obligated to pay, and Employee will be entitled to receive: (i) the Base Salary earned through the date of termination and which has not yet been paid; (ii) accrued but unused vacation pay; and (iii) any business expenses incurred by Employee but unreimbursed as of the date of termination, provided that such expenses are submitted in accordance with the BMW Company policy (collectively, "Final Compensation"). Final Compensation (other than expenses not yet submitted) shall be paid to Employee on the next regularly scheduled payroll date, unless otherwise required by applicable law. In addition, (x) Employee will be entitled to any vested benefits to which Employee is entitled under the terms of any applicable benefit plan or program, which such entitlement shall be determined by the terms of any such plan or program, and (y) to continue, at Employee's own cost, participation in the BMW Company's health insurance pursuant to COBRA or other applicable law.

    (b)    Death; Disability. Upon termination of Employee's employment upon the death of Employee or upon Employee's becoming disabled, the BMW Company will be obligated to pay, and Employee will be entitled to receive all of the amounts and vested benefits described in Section 6.3(a).

    (c)    Severance; Release. If Employee's employment is terminated by the BMW Company without Cause or terminated by the Employee with Good Reason (as defined below), then in addition to Employee's entitlements provided for in Section 6.3(a), the BMW Company will be obligated to pay and Employee will be entitled to receive an amount equal to Employee's then current Base Salary for a period of twelve (12) months (such period, the "Severance Period," and such amount, the "Severance Amount"), paid out in equal installments in accordance with the regular payroll schedule of the BMW Company commencing within sixty (60) days of Employee's date of termination. Notwithstanding the foregoing, payment of the Severance Amount is conditioned upon Employee executing and not revoking a separation agreement and general release in a form to be provided by the BMW Company (the "Release") such that the Release is effective no later than sixty (60) days following the Employee's date of termination. Notwithstanding the foregoing, to the extent the period for Employee to execute the Release spans two (2) calendar years, in no event will the installments commence prior to the first regularly

scheduled payroll period in the second taxable year. Termination for "Good Reason" shall mean, without Employee's written consent, (i) a reduction by the BMW Company of Employee's Base Salary, unless the Company simultaneously decreases the compensation of similarly-situated employees or (ii) a material diminution in the authority, responsibilities or duties of the Employee. A termination of employment by Employee for Good Reason shall be effectuated by giving the BMW Company written notice ("Notice of Termination for Good Reason"), not later than fifteen (15) days following the initial occurrence of the circumstance that constitutes Good Reason.  The Company shall be entitled, during thirty (30) day period following receipt of a Notice of Termination for Good Reason, to cure the circumstances that gave rise to Good Reason (the "Cure Period").  If, during the Cure Period, such circumstance is reasonably remedied, Employee will not be permitted to terminate employment for Good Reason as a result of such circumstance.  If, at the end of the Cure Period, the circumstance that constitutes Good Reason has not been reasonably remedied, Employee will be entitled to terminate employment for Good Reason during the thirty (30)-day period that follows the end of the Cure Period.  If Employee does not terminate employment during such thirty (30)-day period, Employee will not be permitted to terminate employment for Good Reason as a result of such event.  For the avoidance of doubt, in no event shall Employee be entitled to receive any Severance Amount from the BMW Company in the event Employee is terminated for Cause or if Employee terminates his employment with the BMW Company without Good Reason.

7.    **Tax Matters**.

(a) Withholdings. Employee's compensation under this Agreement will be subject to such withholding as may be required by law, as determined by the BMW Company.

(b) Section 409A. Each payment under this Agreement, including each payment in a series of installment payments, is intended to be a separate payment for purposes of Treas. Reg. §1.409A-2(b), and is intended to be: (i) exempt from Section 409A of the Internal Revenue Code of 1986, as amended (the "Code"), the regulations and other binding guidance promulgated thereunder ("Section 409A"), including, but not limited to, by compliance with the short-term deferral exemption as specified in Treas. Reg. § 1.409A-1(b)(4) and the involuntary separation pay exception within the meaning of Treas. Reg. §1.409A-1(b)(9)(iii), or (ii) in compliance with Section 409A, including, but not limited to, being paid pursuant to a fixed schedule or specified date pursuant to Treas. Reg. § 1.409A-3(a) and the provisions of this Agreement will be administered, interpreted and construed accordingly, including any ambiguity herein. If, nonetheless, this Agreement either fails to satisfy the requirements of Section 409A or is not exempt from the application of Section 409A, then the parties hereby agree, to the extent permitted by Section 409A, to amend or to clarify this Agreement in a timely manner so that this Agreement either satisfies the requirements of Section 409A or is exempt from the application of Section 409A, provided, however, that, to the greatest extent possible, no such amendment or clarification shall reduce the economic benefit that Employee was to derive from this Agreement prior to such amendment or clarification. Notwithstanding any provision of this Agreement to the contrary, in no event will Employee directly or indirectly designate the calendar year of a payment and any Severance Amount conditioned on a Release that is deemed to be deferred compensation under Section 409A and that could be made in more than one taxable year shall be made in the later taxable year.  A termination of employment shall not be deemed to have occurred for purposes of

any provision of this Agreement providing for the payment of any amounts or benefits considered "nonqualified deferred compensation" under Section 409A upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If Employee is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is considered nonqualified deferred compensation under Section 409A payable on account of a "separation from service," such payment or benefit shall be made or provided at the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of such "separation from service" of Employee, and (ii) the date of Employee's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this subsection (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed on the first business day following the expiration of the Delay Period to Employee in a lump sum and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein. With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, (ii) the amount of expenses eligible for reimbursement, or in-kind benefits, provided during any taxable year shall not affect the expenses eligible for reimbursement, or in-kind benefits, to be provided in any other taxable year, and (iii) such payments shall be made on or before the last day of Employee's taxable year following the taxable year in which the expense occurred.

(c)   Section 280G.   If any payment or benefit Employee would receive (directly or indirectly) from the BMW Company or otherwise ("Payment") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code; and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "Excise Tax"), then such Payment shall be equal to the Reduced Amount. The "Reduced Amount" shall be either (x) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax; or (y) the largest portion, up to and including the total, of the Payment, whichever amount, after taking into account all applicable federal, state and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in Employee's receipt, on an after-tax basis, of the greater amount of the Payment. Any reduction made pursuant to this Section 7(c)(i) shall be made in accordance with the following order of priority: (i) Full Credit Payments (as defined below) that are payable in cash, (ii) non-cash Full Credit Payments that are taxable, (iii) non-cash Full Credit Payments that are not taxable, (iv) Partial Credit Payments (as defined below), and (v) non-cash employee welfare benefits. In each case, reductions shall be made in reverse chronological order such that the payment or benefit owed on the latest date following the occurrence of the event triggering the excise tax will be the first payment or benefit to be reduced (with reductions made pro-rata in the event the same priority payments or benefits are owed at the same time). "Full Credit Payment" means a payment, distribution or benefit, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, that if reduced in value by one dollar reduces the amount of the parachute payment (as defined in Section 280G of the Code) by one dollar, determined as if such payment, distribution or benefit had been

paid or distributed on the date of the event triggering the excise tax. "Partial Credit Payment" means any payment, distribution or benefit that is not a Full Credit Payment. At the option of the BMW Company, (i) the Payment will be reduced to the Reduced Amount pursuant to Section 7(c)(i) of this Agreement, or (ii) the BMW Company shall submit the Payment for stockholder approval in accordance with the requirements of Section 280G of the Code and the regulations promulgated thereunder; provided that Employee acknowledges and agrees that, in connection with the stockholder approval process, Employee is required to waive Employee's right to receive and/or retain all or a portion of the Payment in the event the requisite number of stockholder(s) do not validly approve the payments as required by Section 280G.

8.     **Severability**

If any provision (or portion thereof) of this Agreement is declared by an arbitrator or court of competent jurisdiction to be invalid or unenforceable, the remaining provisions (or portions thereof) shall remain in full force and effect and, to the extent possible, the disputed provision (or portion thereof) shall be construed so that it may be valid and enforceable.

9.     **Waiver**

No failure or delay in exercising any right, power or privilege in respect of the Agreement shall act as a waiver to a later demand for full and complete performance.

10.    **Governing Law**

Construction and interpretation of the Agreement shall at all times and in all respects be governed by the laws of the State of California, without regard to the rules or principles of conflicts or choice-of-law that might look to any jurisdiction outside of California.

11.    **Entire Agreement**

With the exception of Employee's obligations under that certain Asset Purchase Agreement, dated [date], that certain Confidential Information and Assignment of Inventions Agreement dated of even date herewith, and the Non-Competition and Non-Solicitation Agreement dated of even date herewith, which remain in place, this Agreement constitutes the entire agreement and understanding between Employee and the Companies, and supersedes any prior verbal or written contracts, agreements and/or obligations by and between Employee and the Companies.  The terms of this Agreement may be changed only in writing, signed by both parties hereto.

12.    **Miscellaneous**

10.1    Employee understands that, except for Employee employment at-will status, the BMW Company reserves the right, on behalf of itself and the other Companies, to revise, modify, add to, or delete, any and all policies, procedures, work rules, benefits, or terms and conditions of your employment, upon reasonable advanced notice.  As provided in Section 2 of this Agreement, any change to the at-will employment relationship must be by a specific, written agreement signed by Employee and the LLC Manager of the BMW Company.

10.2    Employee's continued employment with the BMW Company is conditioned on (1) Employee's initial verification, and continued maintenance, of Employee's legal right to work in the United States, (2) Employee's signing of the BMW Company's Confidential Information and Assignment of Inventions Agreement, attached hereto as Exhibit "1"; (3) Employee's acknowledgment of the BMW Company's Employee Handbook.

10.3    The parties agree that this Agreement shall be binding on, and inure to the benefit of, each of the Companies' successors and assigns.  The BMW Company reserves the right to assign or transfer any or all of its or their rights and responsibilities under this Agreement to another party or entity.

10.4    This Agreement and any rights herein granted are specific to Employee and shall not be assigned, sublicensed, or subcontracted without the BMW Company's prior written consent. Any assignment, sublicense encumbrance or subcontract in violation of the terms herein shall be void.


**IN WITNESS WHEREOF**, this Agreement has been duly executed by the parties.

Dated: [Date]                   **CHRISTOPHER J. WILSON**



By:    _____
                Christopher J. Wilson



Dated: [Date]                   [**LEGAL EMPLOYING ENTITY**]



By:    _____

Title:    _____

# EXHIBIT "1"

## CONFIDENTIAL INFORMATION AND ASSIGNMENT OF INVENTIONS AGREEMENT

This Confidential Information and Assignment of Inventions Agreement (the "Agreement") is made and entered into on [Date], by and between, on the one hand, [FA CA Fresno-B, LLC, a Delaware limited liability company] (the "Company"), and, on the other hand, Christopher J. Wilson ("Employee"), an individual. The Company and Employee may be referred to herein jointly as "the parties" or individually as "the party."

In consideration for Employee's initial and continued employment with the Company, Employee's receipt of compensation (including, but not limited to, salary, commissions, or bonuses), Employee's access to the Company's confidential information and other benefits associated with Employee's employment, and other good and valuable consideration, the receipt of which Employee acknowledges, Employee agrees as follows:

1.    **Competitive Business**.  Employee acknowledges that the business and services of the Company and its affiliates are highly specialized, the identity and particular needs of the Company's and its affiliates' customers, suppliers, and independent contractors are not generally known, and the documents, records, and information regarding the Company's and its affiliates' customers, suppliers, independent contractors, services, methods of operation, policies, procedures, sales, pricing, and costs are highly confidential information and constitute trade secrets.  Employee further acknowledges that the services rendered to the Company by Employee have been or will be of a special and unusual character which have a unique value to the Company and its affiliates and that Employee has had or will have access to trade secrets and confidential information belonging to the Company and its affiliates, the loss of which cannot be adequately compensated by damages in an action at law.

2.    **Confidential Information**.  Employee agrees to not use for any purpose or disclose to any person or entity any Confidential Information, except as required in the performance of Employee's duties to the Company. "Confidential Information" means information that the Company or any of its affiliates has obtained in connection with its present or planned business, including information Employee developed in the performance of Employee's duties for the Company or its affiliates, the disclosure of which could result in a competitive or other disadvantage to the Company or its affiliates.  "Confidential Information" includes, but is not limited to, all information of Company and its affiliates to which Employee has had or will have access, whether in oral, written, graphic or machine-readable form, including without limitation, records, lists, specifications, operations or systems manuals, decision processes, policies, procedures, profiles, system and management architectures, diagrams, graphs, models, sketches, technical data, research, business or financial information, plans, strategies, forecasts, forecast assumptions, business practices, marketing information and material, customer names, vendor lists, independent contractor lists, identities, or information, proprietary ideas, concepts, know-how, methodologies and all other information related to Company's business and/or the business of any of its affiliates, knowledge of the Company's or its affiliates' customers, suppliers, employees, independent contractors, methods of operation, trade secrets, software, software code, methods of determining prices.  Confidential Information shall also include all information of a third party to which Company and/or any of its affiliates have access and to which Employee has had or will have access.  Employee will not, directly or indirectly, copy, take, disclose, or remove

Page **1** of **8**

from the Company's or its affiliates' premises, any of the Company's or its affiliates' books, records, customer lists, or any Confidential Information. Employee acknowledges and understands that, pursuant to the Defend Trade Secrets Act of 2016: An individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (i) is made (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Further, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the individual's attorney and use the trade secret information in the court proceeding if the individual: (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

3. **Return of Property**.  Upon the termination of Employee's employment with the Company for any reason, Employee shall promptly deliver to the Company all records, correspondence, drawings, blueprints, manuals, letters, notes, notebooks, reports, flowcharts, programs, proposals, and any documents or electronic data concerning the Company's and its affiliates' employees, independent contractors, customers or concerning products or processes used by the Company and/or its affiliates and, without limiting the foregoing, will promptly deliver to the Company any and all other documents, records, electronic data, or materials containing or constituting Confidential Information.

4. **Non-Solicitation of Employees During Employment**.  During the term of Employee's employment with the Company, Employee will not, either on Employee's own account or for any person, firm, partnership, corporation, or other entity (a) solicit, interfere with, or endeavor to cause any employee of the Company or its affiliates to leave employment with the Company or its affiliates; or (b) induce or attempt to induce any such employee to breach their obligations to the Company or its affiliates.

5. **Non-Solicitation of Employees After Employment**.  After Employee's separation from employment with the Company for any reason whatsoever, Employee will not, either on Employee's own account or for any person, firm, partnership, corporation, or other entity, use the Company's or its affiliates' trade secrets to (a) solicit, interfere with, or endeavor to cause any employee of the Company or its affiliates to leave employment with the Company or its affiliates; or (b) induce or attempt to induce any such employee to breach their obligations to the Company or its affiliates.

6. **Anti-Raiding of Employees**. Employee agrees that for a period of one year after Employee's separation from employment with the Company for any reason whatsoever, whether using the Company's or its affiliates' trade secrets or not, Employee shall not disrupt, damage, impair, or interfere with the Company's or its affiliates' business by raiding the Company's or its affiliates' employees.

7. **Non-Solicitation of Customers During Employment**.  During the term of Employee's employment with the Company, Employee will not solicit, induce, or attempt to induce any past or current customer of the Company or its affiliates (a) to cease doing business, in

whole or in part, with the Company or its affiliates; or (b) to do business with any other person, firm, partnership, corporation, or other entity which performs services similar to or competitive with those provided by the Company or its affiliates.

8.    **Non-Solicitation of Customers After Employment**.  After Employee's separation from employment with the Company for any reason whatsoever, Employee will not, either on Employee's own account or for any person, firm, partnership, corporation, or other entity, use the Company's or its affiliates' trade secrets to solicit, induce, or attempt to induce any past or current customer of the Company or its affiliates (a) to cease doing business, in whole or in part, with the Company or its affiliates; or (b) to do business with any other person, firm, partnership, corporation, or other entity which performs services similar to or competitive with those provided by the Company or its affiliates.

9.    **Remedies**.  In addition to all of the remedies otherwise available to the Company, the Company shall have the right to injunctive relief to restrain and enjoin any actual or threatened breach of Sections 2, 3, 4, 5, 6, 7, 8, and 9 of this Agreement. All of the Company's remedies for breach of this Agreement shall be cumulative and the pursuit of one remedy will not be deemed to exclude any other remedies.

10.    **Loyalty and Best Efforts**.  Employee agrees to be a loyal employee of the Company. Employee agrees to devote Employee's best efforts to the performance of Employee's duties for the Company, to give proper time and attention to furthering the Company's business, and to comply with all policies of the Company.  Employee further agrees that during Employee's employment with the Company, Employee shall not, directly or indirectly, engage in any business which would detract from Employee's ability to apply Employee's best efforts to the performance of Employee's duties.  Employee also agrees not to usurp any corporate opportunities of the Company or its affiliates.

11.    **At-Will Employment**. Employee acknowledges that Employee's employment is at-will, which means that either Employee or Company may end the employment relationship at any time and for any reason.  Neither Employee nor the Company has agreed upon employment for a specific period of time.  Nothing in this Agreement changes this at-will nature of Employee's employment.

12.    **Reasonable Restrictions**.  Employee has carefully read and considered this Agreement and agrees that the restrictions set forth in Sections 2, 3, 4, 5, 6, 7, and 8 are fair and reasonable and are reasonably required for protection of the Company's and its affiliates' Confidential Information, trade secrets, and goodwill. Employee represents and warrants that Employee's experience and capabilities are such that the restrictive covenants set forth herein will not prevent Employee from pursuing Employee's livelihood.

13.    **Assignment of Inventions**.  Employee will promptly make full written disclosure to the Company any ideas, inventions, works of authorship (including but not limited to computer programs, software, and documentation), improvements, or discoveries, whether or not patentable or copyrightable ("Work Product"), which during the term of Employee's employment, Employee may conceive, make, develop, work on, or first reduce to practice, in whole or in part, either solely

Page **3** of **8**

or jointly with others, whether or not reduced to drawings, written description, documentation, models, or other tangible form. All ideas, inventions, works of authorship (including but not limited to computer programs, software, and documentation), improvements, or discoveries, whether or not patentable or copyrightable ("Work Product") of Employee shall be deemed to be "works made for hire" owned by the Company. To the extent that any such Work Product is not deemed to be a "work made for hire", Employee hereby assigns to the Company, its successors and assigns, without further consideration, all right, title and interest therein, including without limitation, all patents, copyrights, mask works and other statutory and common law protection in any and all countries worldwide. The provisions of this Section requiring the assignment of Work Product do not apply to any Work Product that qualifies under California Labor Code section 2870, *i.e.*, developed entirely on the Employee's own time without using the Company's equipment, supplies, facilities, or trade secret information, except for those inventions that either (i) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research or development of the Company, or (ii) result from any work performed by you for the Company. California Labor Code section 2870 is reproduced in the attached Written Notification to Employee in Exhibit "A" (attached hereto). You further represent that the Schedule "A" (attached hereto) contains a complete list of all inventions made, conceived, or first reduced to practice by you, under your direction or jointly with others prior to your employment with the Company and which are not assigned to the Company hereunder ("Prior Work Product"). If there is nothing listed on the Schedule "A," you represent that there are no such Prior Work Product.

14. **Successors and Assigns**. The parties agree that this Agreement shall be binding on, and inure to the benefit of, the Company's successors and assigns. The Company reserves the right to assign or transfer any or all of its or their rights and responsibilities under this Agreement to another party or entity.

15. **California Agreement**. This Agreement is governed by the laws of the State of California. The federal and state courts in the State of California shall have jurisdiction over any dispute that arises under this Agreement, and each party submits and hereby consents to such court's jurisdiction.

16. **Severability and Reformation**. The provisions, or portions thereof, of this Agreement will be deemed severable, and the invalidity or unenforceability of any one or more of the provisions, or portions thereof, will not affect the validity or enforceability of any one or more of the other provisions, or portions thereof, herein. If any provisions, or portions thereof, of this Agreement are deemed to exceed the time, geographic, or scope limitations permitted by applicable law, then such provisions, or portions thereof, shall be reformed to the maximum time, geographic, or scope limitations permissible. The Company expressly reserves the right to limit the scope of these covenants unilaterally.

17. **Obligations to Prior Employers**. Employee represents to Company that Employee has no obligations to concurrent or former employers, or to any person or entity, that might restrict the Employee from performing Employee's duties to the Company. Employee shall not improperly use or disclose any proprietary information or trade secrets of any concurrent or former employer with which Employees has an agreement or duty to keep in confidence.

Page **4** of **8**

18.  **No Modification Unless in Writing**.  No change or modification of this Agreement will be valid or binding unless the same is in writing and signed by the party against whom the waiver is sought to be enforced.

19.  **No Waiver**.  No valid waiver of any provision of this Agreement at any time deemed a waiver will be deemed a valid waiver of such provision at another time.

20.  **Entire Agreement**.  With the exception of Employee's obligations under that certain Asset Purchase Agreement, dated [date], that certain Employment Agreement of even date herewith, and the Non-Competition and Non-Solicitation Agreement dated of even date herewith, which remain in place, this Agreement contains the entire agreement and understanding by and between the Company and the Employee with respect to the subject matter of this Agreement.

**IN WITNESS WHEREOF**, this Agreement has been duly executed by the parties.

Dated: [Date]                    **CHRISTOPHER J. WILSON**


By:   _____
        Christopher J. Wilson


Dated: [Date]                    **[LEGAL EMPLOYING ENTITY]**


By:   _____

Title: _____

**Exhibit "A" – Written Notification to Employee**

Reproduction of California Labor Code section 2870

2870.  (a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

   (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

   (2) Result from any work performed by the employee for the employer.

   (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

**Schedule "A" – List of Employee's "Prior Work Product"**

_____

_____

_____

_____

## SCHEDULE 1.1

### PURCHASED ASSETS

      A.      <u>New Vehicles & Demonstrators</u>.

All new vehicle and demonstrator inventory with less than two hundred fifty (250) miles, not previously titled, registered or reported sold, of 2019 and newer model year BMW, Audi, and Porsche model cars and SUV/trucks located at the Property and owned by Seller as of the Closing Date ("<u>New Vehicles</u>"), shall be purchased at the cost to Seller of each such vehicle as reflected on the Manufacturer invoice <u>less</u> any factory holdback, factory rebates, factory discounts, factory incentives and carry-over model allowances, if paid to the Seller prior to Closing, or credited or to be credited to Seller's account, <u>less</u> any advertising credits, and any floor plan interest credits on those vehicles in stock at Closing, <u>plus</u> any additional equipment or accessories that has been installed in the ordinary course of business at Seller's net cost (including cost of labor), <u>less</u> any equipment or accessories removed in the ordinary course of business at Seller's net cost (including cost of labor), <u>less</u> any other items that should be reasonably deducted in order to establish Seller's actual net cost of each such vehicle.  The purchase price shall not include any other vehicle preparation charges, labor charges, or other dealer charges of any kind.

New Vehicles with less than 2,500 miles on the odometer but more than 250 miles as of the Closing Date will be reduced by $.50 per mile in excess of 250 miles ("<u>Mileage Deductions</u>"), and Buyer is not obligated to purchase more than ten (10) of such vehicles in the aggregate with Pre-Registered Vehicles having in excess of 250 miles (but less than 2,500 miles) on the odometer. New Vehicles with more than 2,500 miles on the odometer as of the Closing Date will be treated as Used Vehicles (as defined below).  Prior to Closing, Buyer shall inspect the New Vehicle inventory and notify Seller of any damaged New Vehicles. Notwithstanding anything herein to the contrary, if the cost of repairing the damage exceeds Eight Hundred United States Dollars ($800) at dealer cost or if as a result of the damage and repair, state or federal law requires that such damage or repair be disclosed to a retail buyer, then that vehicle shall be treated as a Used Vehicle for purposes of determining the Purchase Price. If the cost of repairing any damage is equal to or less than Eight Hundred United States Dollars ($800) at dealer cost and no notice to a retail Buyer will be required, then Buyer shall be obligated to purchase that vehicle as a New Vehicle, subject to an additional reduction in the purchase price of that vehicle by the actual net cost of repairing such damage ("<u>Damage Deductions</u>"). If Buyer and Seller are unable to agree upon the Damage Deductions, then Buyer and Seller shall select an independent, third party to determine the Damage Deductions. The independent determination shall be binding upon both Buyer and Seller and the cost of such third party shall be paid equally the Parties.

      B.      <u>Pre-Registered Vehicles</u>.

All inventory with less than two-hundred fifty (250) miles which would otherwise constitute a New Vehicle but for the fact that it was previously registered, of 2019 and newer model year BMW, Audi, and Porsche model cars and SUV/trucks located at the Property and owned by Seller as of the Closing Date ("<u>Pre-Registered Vehicles</u>"), shall be valued in the same manner as New Vehicles in <u>Section A</u> above (including, without limitation, the Mileage Deductions for Pre-Registered Vehicles with up to 2,500 miles and the Damage Deductions), with an additional deduction of 2% off of the Seller's actual net cost of such vehicle per month for each month any such Pre-Registered Vehicle has been held in inventory at the Dealership. The purchase price shall not include any other vehicle preparation charges, labor charges, or other dealer charges of any kind.  Buyer is not obligated to purchase more than ten (10) Pre-Registered Vehicles with mileage in excess of 250 miles, but less than 2,500 miles, in the aggregate with New Vehicles having in excess of 250 miles (but less than 2,500 miles) on the odometer.  Pre-Registered Vehicles with more than 2,500 miles on the odometer as of the Closing Date will be treated as Used Vehicles (as defined below).

C.    <u>Parts</u>.

(i)    All new, unused, undamaged, non-obsolete OEM parts and accessories located on the Property or in transit to the Property on the Closing Date which are listed in the Manufacturer's current parts and accessories price book and that are eligible for return shall be purchased at the Manufacturer's current cost to dealer.  A part or accessory shall be deemed obsolete if it has not shown a sale in the twelve (12) months prior to Closing, unless the part or accessory qualifies for a return and/or credit from the Manufacturer.

(ii)    All non-returnable, non-manufacturer, special order, non-stock, jobber and/or NPN parts and accessories located on the Property or in transit to the Property on the Closing Date may be purchased by Buyer at Seller's verified cost.  However, Buyer will not be obligated to purchase any obsolete parts or accessories.

(iii)    All supplies on hand, including, gas, oil and grease inventory, shall be purchased at Seller's net cost, based upon a physical inventory to be made on the Closing Date.  With respect to non-bulk oil, grease, fluids and solvents, Buyer shall only purchase such inventories that are in unopened containers.

(v)    All of Seller's return privileges concerning parts for any time periods prior to or after the Closing Date, as applicable, and any and all other assignable rights arising out of or under any express or implied warranties from suppliers with respect to the Purchased Assets shall be assigned by Seller to Buyer.

(vi)    Seller will remove from the Property any parts that are not purchased by Buyer, at Seller's sole expense, within sixty (60) days after the Closing Date.  Buyer will accept no responsibility for any parts left on the Property after said period.

(vii)    An inventory list (the "<u>Inventory</u>") shall be prepared on or before the Closing Date by a third party firm mutually agreeable to the Parties.  The Inventory (insofar as it relates to parts and accessories, supplies and work-in-process) shall be compared to the Manufacturer's approved system of inventory control and will show each item extended by its unit price.  An independent inventory service shall be utilized to perform the actual count of the Inventory and will take place approximately one week prior to the scheduled Closing Date.  Buyer and Seller shall split the cost of the inventory service evenly between Buyer and Seller.

D.    <u>Used Vehicles.</u>

Any vehicle not classified as a New Vehicle, Pre-Registered Vehicle, or Leased Vehicle and which has been in inventory sixty (60) or fewer days shall be deemed a used vehicle ("<u>Used Vehicle</u>").  The offer price for Used Vehicles shall be the lesser of (i) Seller's actual cost, and (ii) current market value as determined based on used black book values based on the Manheim Market Report ("<u>MMR</u>").  Any vehicle not classified as a New Vehicle, Pre-Registered Vehicle, Leased Vehicle or Used Vehicle (the "<u>Other Vehicles</u>") shall be purchased at a mutually agreed price between the Buyer and Seller.  Seller shall provide Buyer with a detailed list of the Used Vehicles and Other Vehicles not less than fifteen

(15) days prior to Closing.  Buyer will provide Seller with an offer price for each of the Used Vehicles and Other Vehicles no later than seven (7) days prior to Closing.  Seller may elect, prior to Closing, to retain and dispose of any Used Vehicle and Other Vehicle for which the Parties cannot agree on a valuation.  Seller shall remove any such retained Used Vehicles and Other Vehicles from the Property no later than two (2) days after the Closing.

E.    Lease and Rental Vehicles.

Seller's lease and rental vehicles not classified as New Vehicles or Pre-Registered Vehicles (collectively, "Lease Vehicles") which are in stock on the Closing Date, shall be purchased by Buyer at: (i) with respect to non-Audi Lease Vehicles, the lesser of fair market value or the depreciated value as per Seller's financial statements, and (ii) with respect to Audi Lease Vehicles, the lease residual value as set by the Manufacturer.

F.    Fixed Assets.

All fixed assets relating to or used in connection with the Dealerships and owned by Seller, including, without limitation, machinery and equipment, signage, office supplies, computer hardware and software, furniture and other miscellaneous tangible items (but excluding leasehold improvements and Lease Vehicles), shall be purchased at the aggregate net book value of such assets.  Buyer and Seller shall conduct a physical inventory of the fixed assets subject to this Agreement in a timely manner so that the valuation of such fixed assets will be available for the Closing.  Seller shall obtain Buyer's prior written consent to purchase, prior to Closing, any item the cost of which exceeds $5000.

G.    Sublet Repair and Work-in-Process.

In connection with sublet repairs and work-in-process, Seller shall continue to intake such work using its historical standards between the date of this Agreement and the Closing Date.  So long as sublet repairs and work-in-process is done in a commercially reasonable manner for which Seller possesses an initial open repair order signed by the customer authorizing repairs, Buyer will purchase such items from Seller at a price equal to Seller's actual expended cost as of the Closing Date.  Buyer will have the opportunity to review all sublet repairs and work-in-process prior to Closing and Buyer and Seller shall negotiate in good faith any disagreements on the value of such items.

H.    New Vehicle Deposits.

As of the Closing Date, all signed, bona fide, arms-length unfulfilled contracts for the sale or lease of New Vehicles, Pre-Registered Vehicles, and Used Vehicles ("Sales Orders") will be transferred to Buyer upon transfer to Buyer by Seller of the deposit specified in each such Sales Orders (the "Vehicle Deposit") in full; provided that such Sales Orders have been entered into in the ordinary course of business and provide for a profit in accordance with the ordinary course of business of the Dealerships; and provided further, that Buyer has the right to approve, in its reasonable discretion, all proposed trade-in allowances on Used Vehicles to be taken in trade for New Vehicles, which will not be delivered by Seller prior to Closing. Buyer shall retain any profit on such sales.

I.    Other Deposits and Pre-Paid Expenses.

All other deposits collected by Seller that are not classified as Vehicle Deposits and any pre-paid expenses paid by Seller will be purchased by Buyer, on a dollar for dollar basis, provided that the Buyer retains the benefit of such deposit or pre-paid expense after Closing.  Any deposits or pre-paid expenses paid by Seller subsequent to the date of this Agreement shall be subject to the reasonable approval of Buyer.

J.        Assumed Contracts.

Buyer will assume the contracts set forth on Schedule 1.3, which contracts Buyer agrees to assume in accordance with Section 1.3 of this Agreement.

K.        Business Records.

Seller's sales journals, repair order files, parts files, customer lists (including, without limitation, all customer lists and contact information relating to the wholesale parts and service operations of the Dealerships), customer contacts, vendor lists, technical and repair data and manuals, and invoices (the "Records") will be transferred to Buyer for no additional compensation. In addition, Buyer will retain all retail customer files relating to the Dealerships and the associated Purchased Assets. Seller may request from Buyer copies of all or any portion of the Records, all expenses related to which will be borne by Seller alone. Buyer will provide storage of the Records at no cost to Seller for a period of seven (7) years from the Closing Date. All other records of Seller, including, but not limited to, perpetual inventory records and all other operating data and records used in connection with the Dealerships, such as books, records, order files, purchasing records, credit histories and supplier information shall be retained by Seller and removed from the Dealerships within one hundred eighty (180) days after the Closing Date.

L.        Goodwill.

Buyer shall pay Seller an amount equal to Sixteen Million and 00/100 Dollars ($16,000,000) for goodwill for the Seller's BMW, Audi, and Porsche franchises and all associated intangible assets (the "Intangible Asset Purchase Price"). The allocation of the Intangible Asset Purchase Price shall be to franchise value, blue sky or goodwill, as determined by Buyer and Seller and shall be reported consistently by Buyer and Seller for income tax purposes.

M.        We Owes.

The Parties shall deduct from the Purchase Price an amount equal to the sum of all outstanding we-owes issued by Seller to consumers prior to the Closing Date, which shall be reflected at the Closing on Schedule 1.1(M).

N.        Miscellaneous Assets.

Buyer shall purchase the following assets (collectively "Miscellaneous Assets") for a sum of $1:

(i)        The right to use secondary telephone number or numbers used by the Dealerships immediately prior to the Closing Date;

(ii)       Except for the Excluded Assets, all other property and rights, tangible and intangible (including domain names, urls, websites and other internet and social media based property), real, personal or mixed, which Seller owns, uses or is acquiring in connection with the BMW, Audi, and Porsche Business, wherever located and regardless of whether reflected on Seller's books and records, including, without limitation, the "BMW Fresno", "Audi Fresno", and "Porsche Fresno" names or any derivatives of the same.

Any other assets owned by Seller not listed above are not being acquired and shall be retained by Seller, including, but not limited to, cash, bank balances, monies in possession of banks and other depositories, term deposits, and similar cash items of Seller or held by or for the account of Seller, accounts receivable,

accrued earnings and holdbacks, health plans and other benefit programs, and corporate, accounting, tax and other records of Seller not relating exclusively or primarily to the Dealerships.  Notwithstanding the foregoing, Seller shall also have the right to retain any asset valued at $0 according to the above methodology, or on which the Parties have mutually agreed to be worth $0.

Notwithstanding the foregoing, any funds available through programs or credits from the Manufacturer shall be split between Buyer and Seller in a prorated manner.

## SCHEDULE 1.1(H)

### FIXED ASSETS


**[BUYER AND SELLER TO FINALIZE PRIOR TO CLOSING DATE]**

**SCHEDULE 1.2**

**EXCLUDED ASSETS**

1)      Cash, bank balances, money's in possession of banks and other depositories, term deposits and similar cash items of Seller or held by or for the account of Seller;

2)      Corporate, financial, tax, and other records of Seller not relating exclusively or primarily to the Business; and

3)      Any personal items of Seller identified below:

        **[INSERT]**

## SCHEDULE 1.3

### ASSUMED CONTRACTS

## SCHEDULE 2.3

## ALLOCATION OF PURCHASE PRICE

**[TO BE COMPLETED BY BUYER AND SELLER AT CLOSING]**

## SCHEDULE 4.1(d)

## LITIGATION

## SCHEDULE 4.1(e)

## MATERIAL AGREEMENTS

**SCHEDULE 4.1(f)**

**EMPLOYEES**

**SCHEDULE 4.1(g)**

**TYPES OF TAX RETURNS**

**SCHEDULE 4.1(h)**

**EXISTING SUBLEASES, LICENSES AND OTHER RIGHTS OF OCCUPANCY**

## SCHEDULE 4.1(i)

### ENVIRONMENTAL CONDITIONS

## SCHEDULE 4.1(j)

## EMPLOYEE BENEFIT MATTERS

## SCHEDULE 4.1(k)

**DEBT**

## SCHEDULE 4.1(l)

## FINANCIAL STATEMENT LIST

**SCHEDULE 4.1(m)**

**INSURANCE POLICIES**

## SCHEDULE 4.1(n)

## PROPRIETARY RIGHTS

**SCHEDULE 4.1(o)**

**APPROVALS**

## SCHEDULE 4.1(p)

## PRODUCT LIABILITY

**SCHEDULE 4.1(q)**

**MANUFACTURER MATTERS**

**SCHEDULE 4.1(s)**

**PRIOR OPERATIONAL NAMES**

**SCHEDULE 4.1(t)**

**BUSINESS MARKETING PLANS**

## SCHEDULE 4.1(u)

## NO DAMAGED VEHICLES

## SCHEDULE 4.1(y)

## OPERATION OF BUSINESS

**SCHEDULE 4.1(z)**

**LIABILITIES**